**M.P. CRUM COMPANY, Appellant,**

v.

**FIRST SOUTHWEST SAVINGS & LOAN ASS'N, Appellee.**

**No. 12–84–0051–CV.**

Court of Appeals of Texas, Tyler.

Jan. 30, 1986.

Robert H. Renneker, Christopher M. Weil, P.C., Dallas, for appellant.

John H. Minton, Potter, Quinn, Minton & Roberts, Tyler, for appellee.

SUMMERS, Chief Justice.

This is an appeal from a judgment notwithstanding the verdict awarding appellee, First Southwest Savings and Loan Association (First Southwest), the sum of $107,924.16 plus interest and attorneys' fees. The sum represents the deficiency remaining after a foreclosure sale following default on a loan by appellant, M.P. Crum Company (Crum). We reverse and render.

On April 2, 1981, First Southwest loaned approximately $280,000 to Crum. The loan was secured by the pledge of nine home

mortgages owned by Crum as mortgagee. On October 1, 1981, the debt was renewed and extended by a second promissory note in the same amount. The debt was to be repaid within 180 days.

Crum defaulted on the loan and on September 30, 1982, First Southwest notified Crum that it would conduct a private sale of the collateral if the entire indebtedness was not repaid by October 15, 1982. A few months later, in January 1983, First Southwest filed suit against Crum to recover on the debt. On April 11, 1983, First Southwest bought the nine mortgages itself (rather than soliciting bids or conducting a public sale of the collateral) and credited Crum with $210,127.01, allegedly representing the fair market value of the mortgages at the time.

The case came to trial on November 30, 1983. At that time, the court allowed First Southwest to amend its pleadings to state:

> After all lawful credits, payments and offsets, there remains due and owing on the note as of November 30, 1983, the sum of $107,924.16 for which sum Plaintiff hereby sues. The collateral was sold in a commercially reasonable manner. The collateral was of a type that is customarily sold in a recognized market.

After the evidence was presented, the court submitted four special issues to the jury. The jury answered three of the issues in favor of First Southwest, but responded adversely—"we do not"—in answer to Special Issue No. 3, which reads as follows:

> Do you find from a preponderance of the evidence that the collateral foreclosed upon by [First Southwest] was of a type customarily sold in a recognized market, or was the subject of widely distributed standard price quotations.

Crum moved for judgment based upon the jury's answer to Special Issue No. 3. First Southwest filed a motion to disregard the jury's answer to Special Issue No. 3 and enter judgment for First Southwest. The trial court disregarded the jury's answer to Special Issue No. 3 and rendered judgment notwithstanding the verdict that First Southwest recover $107,924.16 plus interest and attorneys' fees from Crum. From this judgment, Crum appeals.

Crum presents two points of error, alleging that the trial court erred in disregarding the jury's answer to Special Issue No. 3, in granting judgment for First Southwest, and in refusing to grant judgment based upon the jury verdict. We sustain these points, because we find that the jury's answer to Special Issue No. 3 is supported by the evidence and that the answer is material to the outcome of the case.

■ Disposition of collateral by a creditor is governed by TEX.BUS. & COM. CODE ANN. § 9.504(c) (Vernon Supp. 1986), which provides in pertinent part:

> Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts.... [E]very aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor.... The secured party may buy at any public sale and if the collateral is of a type customarily sold in a recognized market or is of a type which is the subject of widely distributed standard price quotations he may buy at private sale.

In order to recover a deficiency, a creditor must prove that he has met the requirements of § 9.504(c), i.e., that he has disposed of the collateral in a commercially reasonable manner and only after giving proper notification to the debtor. *Tanenbaum v. Economics Lab., Inc.*, 628 S.W.2d 769, 771 (Tex.1982). The commercial reasonability of every aspect of the disposition, including the method of sale, is a question of fact. *Siboney Corp. v. Chicago Pneumatic Tool Co.*, 572 S.W.2d 4, 7

(Tex.Civ.App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.). Thus, in order to recover a deficiency, First Southwest had to prove to the jury that its purchase of the block of mortgages at private sale was proper.

The last sentence of § 9.504(c) provides that a creditor (secured party) may only buy collateral at private sale if the collateral is of a type customarily sold in a recognized market or is of a type that is the subject of widely distributed standard price quotations. The term "recognized market" is not defined in the statutes and is rarely discussed in case law. Those cases that have discussed "recognized market" agree that the term is most restrictive. *State Bank v. Hansen,* 302 N.W.2d 760, 765 (N.D.1981); *Turk v. St. Petersburg Bank & Tr. Co.,* 281 So.2d 534, 536 (Fla.Dist.Ct.App.1973). According to J. White & R. Summers, *Uniform Commercial Code* § 26–10 at 1111 (2d ed. 1980):

> Any transaction which involves haggling over price or competitive bidding should not be considered as one conducted on a recognized market ... [where] neutral market forces rather than negotiations between buyer and seller determine price.

A "recognized market," therefore, might be a stock or commodity market, where sales involve many items so similar that individual differences are nonexistent or immaterial, where competition is not a primary factor in each sale, and where prices paid in actual sales of comparable property are currently available by quotation. *O'Neil v. Mack Trucks, Inc.,* 533 S.W.2d 832, 836 (Tex.Civ.App.—El Paso 1975), *rev'd on other grounds,* 542 S.W.2d 112 (Tex.1976); *Norton v. National Bank of Commerce,* 240 Ark. 143, 398 S.W.2d 538, 540 (1966).

The evidence adduced at trial shows that, although home mortgages might in some respects resemble stocks or bonds, they are not customarily sold in a recognized market, nor are they the subject of widely distributed standard price quotations. Even witnesses testifying for First Southwest agree that sellers regularly assemble packages of mortgages and negotiate prices with potential buyers. One mortgage is not necessarily like another, and many factors are considered as buyers and sellers haggle over prices. The Secondary Market Weekly Newsletter does not provide price quotes, but rather lists interest rates being charged nationally on various types of transactions. The Newsletter interest rates merely serve as a benchmark from which other calculations can be made.

According to Tex.R.Civ.P. 301, the trial court may render judgment non obstante veredicto if a directed verdict would have been proper. The trial court cannot disregard a jury finding if there is any evidence of probative force, together with inferences therefrom, that will reasonably support such finding. *Frost Nat'l Bank v. Nicholas & Barrera,* 534 S.W.2d 927, 932 (Tex.Civ.App.—Tyler 1976, writ ref'd n.r.e.). In this case, we hold that the trial court abused its discretion in disregarding the jury's answer to Special Issue No. 3. The evidence clearly supports the jury's finding, which is material to the outcome of the case.

We reverse the judgment of the trial court and render judgment that First Southwest take nothing from Crum.