**Charles N. HAVINS, and Wife, Vera Ann Havins, and Charles B. Havins, Appellants,**

v.

**FIRST NATIONAL BANK OF PADUCAH, Texas, Appellee.**

No. 07–95–0099–CV.

Court of Appeals of Texas, Amarillo, Panel C.

March 27, 1996.

Law Offices of Spencer K. Crouch, Spencer K. Crouch, Wichita Falls, for appellants.

Bird & Bird, Steven R. Bird, Childress, for appellee.

Before REYNOLDS, C.J., and DODSON and QUINN, JJ.

QUINN, Justice.

Charles N. Havins, Vera Ann Havins, and Charles B. Havins appeal from a final judgment in favor of First National Bank of

Paducah, Texas (FNB). In ten points of error, they ask whether the court erred in granting the bank a deficiency judgment, in rescinding a transfer of realty among family members as a fraudulent conveyance, and in ordering foreclosure upon the aforementioned realty. We reverse and remand.

## Background

The controversy arose when FNB sued to collect upon various promissory notes executed by Charles N. Havins (Charles N.). While suit pended but before trial, the bank obtained possession of various items of collateral securing the debt. Included therein were cattle and farm equipment. The former were sold through an auction conducted in Graham, Texas. The latter were never disposed of but remained within the possession of FNB through trial and judgment.

Given that FNB took possession of the collateral and actually sold some of it, Charles N. viewed the action as one seeking a deficiency judgment. Thus, he continued, FNB was obligated to plead and prove that it acted in a commercially reasonable manner and afforded him prior notice of the sale as required by section 9.504 of the Texas Business and Commerce Code. Since it could not satisfy either condition, FNB lost its right to recoup the deficiency, Charles N. concluded.

The court disagreed and entered judgment awarding FNB $782,632.19, foreclosing upon the chattel securing the debt, rescinding a transfer of realty between Charles N., Vera, and Charles B., and ordering foreclosure upon that realty. Findings of fact and conclusions of law accompanied the judgment. Among other things, the court found that the conveyance between Charles N., Vera, and Charles B. was fraudulent, that the cattle sale was commercially reasonable, and that

though no notice of the cattle sale was afforded the debtor none was necessary since beef cattle were sold through a "recognized market."

## Points of Error One, Two, Five, Six, Seven, and Eight

In his first and fifth points of error, Charles N. argues that there was no evidence or insufficient evidence to support the court's finding that the sale was commercially reasonable or that FNB so pled. In points two, six, seven, and eight, Charles N. attacks the judgment by contending that there was no evidence that he was afforded notice of the cattle sale, that there was no evidence to support the finding that the cattle were sold through a recognized market, that cattle are not sold through a recognized market, and that the court could not judicially notice that the auction at bar constituted a recognized market. We agree in part.[1]

### 1. Conditions to Recovering a Deficiency Judgment

■ Before a creditor may recover a deficiency judgment against his debtor, it must satisfy two conditions. The first entails proof that the collateral was disposed of in a commercially reasonable manner, and the second, proof that the debtor received prior notice of the disposition. *Greathouse v. Charter Nat'l Bank–Southwest*, 851 S.W.2d 173, 176 (Tex.1992); *Tanenbaum v. Economics Lab., Inc.*, 628 S.W.2d 769, 771–72 (Tex. 1982).[2] We initially address the matter of a commercially reasonable sale, then turn to the subject of prior notice.

### a. Commercially Reasonable Sale

■ Section 9.504 grants creditors the right, after default by the debtor, to sell,

---

1. The standards of review applicable to "no evidence" and "insufficient evidence" points are well settled and thoroughly discussed in *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264 (Tex.App.—Amarillo 1988, writ denied). We need not repeat them at this time.

2. That the suit at bar was one for deficiency is clear. By the time the action came for trial, the bank had repossessed and sold portions of the collateral. The proceeds garnered were used to

reduce the outstanding balance due from Charles N. This placed it in the posture of recouping the sum due after application of the collateral proceeds, that is, in the posture of recovering deficiency between the debt and value of the collateral sold. *See Gordon & Assoc., Inc. v. Cullen Bank/Citywest, N.A.*, 805 S.W.2d 490, 492 (Tex.App.—Corpus Christi 1990, no writ) (holding that the bank sued for a deficiency at the time of trial since "offsets must be made prior to judgment" even though none existed before suit was filed).

lease or otherwise dispose of any collateral securing payment of the debt. *Tex.Bus. & Com.Code Ann.* 9.504(a) (Vernon 1991). Should they opt to dispose of it, they must take care to assure that "every aspect of the disposition including the method, manner, time, place and terms ... [is] commercially reasonable." *Id.* at 9.504(c).

Though the Code fails to define the term "commercially reasonable," it, nevertheless, provides examples of what may be considered such. For instance, one selling collateral "in the usual manner in any recognized market therefor or ... sell[ing] at the price current in such [recognized] market at the time of ... sale *or* ... [selling] in conformity with reasonable commercial practices among dealers in the type of property sold" does so in a commercially reasonable manner. *Tex. Bus. & Com.Code Ann.* 9.507(b). Again, these modes of conduct are neither required nor exclusive but serve to evince approved activity. *Id.* at 9.507, *U.C.C. comment* 2.

■ Additionally, the legislature has not been the only body to provide some guidance. Courts have also been active. Through concerted effort, they have derived numerous factors considered useful in determining whether someone acted within the bounds of § 9.504(c). The factors include such things as whether the secured party endeavored to obtain the best price possible, whether the collateral was sold in bulk or piecemeal, whether it was sold via private or public sale, whether it was available for inspection before the sale, whether it was sold at a propitious time, and whether the expenses incurred during the sale were reasonable and necessary. *Pruske v. National Bank of Commerce of San Antonio*, 533 S.W.2d 931, 937 n. 1 (Tex.Civ.App.—San Antonio 1976, no writ).[3] The advertising, if any, undertaken and the seller's compliance with existing trade practices among reputable business enterprises also warrant consideration, 9 R. Anderson, *Uniform Commercial Code* 9–504:18 (3rd ed. 1985), as do such things as state of the collateral at the time of sale, the efforts, if

any, of the seller to enhance that state, the number of bids received, the method employed in soliciting bids, the place of sale, and the bona fides of the creditor himself. *Westgate State Bank v. Clark*, 231 Kan. 81, 642 P.2d 961, 971 (1982).

■ In effect, whether a disposition was commercially reasonable involves effort to balance competing policy interests; one being the desire to prevent dishonesty and the other being the need to minimize interference. *Pruske v. National Bank of Commerce of San Antonio*, 533 S.W.2d at 937, *quoting* Hogan, *The Secured Party in Default Proceedings Under the UCC*, 47 Minn. L.Rev. 219–20 (1962). And, since the question is inherently one of fact, *Gordon & Assoc., Inc. v. Cullen Bank/Citywest, N.A.*, 880 S.W.2d 93, 96 (Tex.App.—Corpus Christi 1994, no writ); *M.P. Crum Co. v. First Southwest Sav. & Loan Ass'n*, 704 S.W.2d 925, 926–27 (Tex.App.—Tyler 1986, no writ), much depends upon the totality of the circumstances particular to each case. 9 R. Anderson, *Uniform Commercial Code* 9–504:18. Yet, at the very least, and irrespective of what factors are considered, the evidence presented at trial must describe the method, manner, time, place and terms of the sale. *Tex.Bus. & Com.Code Ann.* 9.504(c); *Federal Deposit Ins. Corp. v. Blanton*, 918 F.2d 524, 529 (5th Cir.1990) (stating that the concept of commercial reasonableness "subsumes the method, manner, time, place and terms of the collateral's disposition").

The record, here, discloses that FNB repossessed various cattle of Charles N. According to the Bank's president, the livestock, "when ... picked up ... were in pretty bad shape ... They were really poor; they were licey and lousey; none of the calves had been worked." Within six weeks, the chattel was taken to Graham, Texas and sold at the "Graham Auction, Cattle Auction Barn." Again according to FNB's president, the auction was "a large cow sale, stocker sale" for cattle similar to that taken from Charles N., and the proceeds received *by the*

---

**3.** Though the creditor may have the obligation to secure the best price possible, his failure to do so, however, does not automatically render the sale commercially unreasonable. *Tex.Bus. &*

*Com.Code Ann.* 9.507(b) (Vernon 1991). It is simply one of many criteria which may be considered.

*bank* totalled $57,825.51. With this, the record says nothing else about the sale.

No one testified that the debtor had prior notice of the sale. Indeed, the bank's president admitted that it sent none, and, more importantly, the trial court so found.[4] Nor did the bank disclose whether the $57,825.51 in sales proceeds represented the actual sales price or net proceeds after deducting seller's commission and other expenses.[5] Similarly absent is evidence illustrating whether the cattle were sold *en masse* or by lot, whether effort was taken to prepare the cattle for sale and thereby enhance their marketability, whether the condition of the cattle at the time of sale was the same as when they were repossessed, whether many or few bidders were present at the sale, whether the advertising purportedly undertaken by either the auction house or the lienholder was *de minimis* or extant,[6] whether efforts were taken to sell the cattle through other means such as private sale, whether the auctioneer had a reputation or the nature of that reputation, whether the auctioneer or the auction house complied with any standard business practices applicable to auctions, whether the cattle sold for a price comparable to the general market price, if any, for similar cattle, or even whether there was an acceptable reason for selling the cattle through an auction house several counties away from the county wherein resided the bank and Charles N.

We mention the foregoing not to suggest that each topic had to be covered but rather to show the miniscule amount of evidence touching upon the subject of commercial reasonableness. That the cattle were sold through an auction, without more, does little to establish the method, manner, time, place, and terms of the disposition as required by section 9.504 of the Commercial Code. *See Gordon & Assoc., Inc. v. Cullen Bank/Citywest, N.A.*, 880 S.W.2d at 97 (holding "[e]vidence which only establishes that collateral was advertised to some extent ... then sold to the highest bidder" insufficient to prove, as a matter of law, that a disposition was commercially reasonable); *compare, Rent America, Inc. v. Amarillo Nat'l Bank*, 785 S.W.2d 190 (Tex.App.—Amarillo 1990, writ denied) (holding the disposition through auction commercially reasonable given evidence of an expert's opinion so stating as well as evidence depicting the collateral's appraised value, the extent of advertising utilized in attracting buyers, and the number of bidders present); *Wilson v. General Motors Acceptance Corp.*, 897 S.W.2d 818, 822 (Tex.App.—Houston [1st Dist.] 1994, no writ) (holding the disposition commercially reasonable given the presence of expert opinion stating as much).[7] In effect, the testimony and documentation presented constitutes *some evidence* of commercial reasonableness, but it is too weak to survive scrutiny under the microscope of factual sufficiency. Consequently, we overrule point of error one but sustain point five.

### b. Notice of the Disposition

As previously mentioned, the creditor must also notify the debtor of the proposed sale. *Greathouse v. Charter Nat'l Bank–Southwest*, 851 S.W.2d at 176; *Tanenbaum v. Economics Lab., Inc.*, 628 S.W.2d at 771–72. However, he need not do so if the collateral "is perishable or threatens to de-

---

4. FNB does not attack the finding as erroneous. Instead, it suggests that a bankruptcy court order afforded Charles N. notice of the sale. The record discloses that Charles N. filed for bankruptcy protection and that an automatic stay arose pursuant to 11 U.S.C. § 362. Though the court granted FNB's motion to "lift the stay," the applicable order mentions nothing about the means or method by which or time in which the cattle were to be disposed. Consequently, that order did not accord Charles N. any notice of the eventual sale. *See Tex.Bus. & Com.Code Ann.* 9.504(c) (Vernon 1991) (stating that the notice must inform the debtor of the time and place of any public sale or the time after which any private sale or disposition is to be made).

5. It most likely represented the amount remaining after the auctioneer deducted his commission and expenses; and, if so, there is no evidence of what the actual sales price was.

6. Mention was made of flyers being circulated. However, nothing reveals whether flyers were actually distributed, the extent of their distribution, or even their content.

7. One court has even suggested that expert testimony may be needed depending upon the means of disposition and the nature of the collateral. *E.g., ITT Commercial Finance Corp. v. Riehn*, 796 S.W.2d 248, 251 (Tex.App.—Dallas 1990, no writ).

cline speedily in value or is of a type customarily sold on a recognized market." *Tex. Bus. & Com.Code Ann.* 9.504(c). The latter circumstance is of import here. Thus, we address whether the cattle were a type of collateral customarily sold on a recognized market.

■ Sadly, and like the phrase "commercially reasonable," the Texas Business and Commerce Code fails to define the term "recognized market." This has, no doubt, caused many consternation. Nevertheless, those who have addressed the subject envision the market as a rare one, *see O'Neil v. Mack Trucks, Inc.*, 533 S.W.2d 832, 836 (Tex.Civ. App.—El Paso, 1975), *rev'd on other grounds*, 542 S.W.2d 112 (Tex.1976) (assigning the term a "restrictive" meaning) wherein 1) price is controlled by neutral forces relatively free of negotiation, 2) competitive bidding is not a primary factor in each sale, 3) the sale involves items so similar that individual differences are non-existent or unimportant, and 4) prices paid in actual sales of comparable property are available by quotation. *M.P. Crum Co. v. First Southwest Sav. & Loan Ass'n*, 704 S.W.2d 925, 927 (Tex.App.—Tyler 1986, no writ) *quoting* J. White & R. Summers, *Uniform Commercial Code* § 26–10 at 1111 (2d ed. 1980); *O'Neil v. Mack Trucks, Inc.*, 533 S.W.2d at 836; *see* 9 R. Anderson, *Uniform Commercial Code* 9–504:27 (3rd ed. 1985) (noting that it contemplates an organized market that handles a large volume of transactions between many different sellers and buyers). Furthermore, they often cite licensed stock and commodities exchanges as examples of the setting contemplated. *Id.*[8]

Yet, in investigating whether a cattle auction falls within its parameters, one comes upon conflicting opinions. Several appellate courts believe that, as a matter of law, it cannot due to the fact that competitive bidding is often the focal point at such sales. *E.g., Wippert v. Blackfeet Tribe*, 215 Mont. 85, 695 P.2d 461, 464 (1985); *State Bank of Towner v. Hansen*, 302 N.W.2d 760, 765 (N.D.1981). Others defer to the facts of each case. *E.g., Cottam v. Heppner*, 777 P.2d 468, 473 (Utah 1989) (holding that livestock auctions may constitute recognized markets if the appropriate circumstances exist); *First Nat'l Bank of Minneapolis v. Kehn Ranch, Inc.*, 394 N.W.2d 709, 714–15 (S.D.1986) (noting that commercial cattle raised specifically for public auction may be had through quotation on a daily basis just as prices for shares on a stock exchange). We believe that the latter group of cases present the better rule.

■ Unlike *Wippert* and *Hansen*, *Cottam* and *Kehn* forego adopting an immutable position. Instead, they implicitly acknowledge that, like questions of commercial reasonableness, much depends on the facts underlying each controversy. Moreover, there is little logic in denying that a cattle auction could be a recognized market if it otherwise satisfies the characteristics of one. To coin the old adage, if it looks, walks, and talks like a duck then why not consider it a duck. So, we conclude that cattle auctions may indeed be recognized markets if they satisfy the indicia of a recognized market.[9]

---

**8.** To say that commodity and stock exchanges are free from all aspects of competitive bidding would be an overstatement. However, in citing the various stock and commodities exchanges as examples of recognized markets, the commentators apparently focus more upon the identity and plentitude of the chattel or choses-in-action sold as well as the availability of a current price quotation derived from the previous sale of similar items.

**9.** We believe that our decision also comports with the general proposition that a true "recognized market" is rare indeed. The property sold through a commodity or stock market is normally identical to other items sold before and after. For instance, a share of Class A common stock in corporation X represents a chose-in-action or property interest that differs little from another

share of Class A common stock in the same company. Thus, the value of each share should be the same at any given point in time. Furthermore, price fluctuations would normally have uniform effect, raising or lowering the worth of each share similarly. Moreover, those price changes would most likely arise from corporate profitability, general economic stability and similar influences distinct from the particular share. Yet, one Hereford steer, for example, is not identical to another. Though their respective price would be influenced by general market considerations outside the control of the particular owner, the latter's conduct would also have an important influential effect, as would the physical condition of the particular steer, the age of the animal, and the like. In other words, the characteristics of livestock are dissimilar to those of commodities or corporate stock. So, it may be

Here, the court determined that though FNB did not notify Charles N. of the sale, the cattle were, nevertheless, the type of collateral customarily sold through a recognized market. With this, it necessarily concluded, though implicitly, that the Graham Auction was a recognized market. We, however, find no evidence supporting either determination.

Other than disclosing that the sale was publicized in some way, was a large one, and was one involving stocker cattle like that of Charles N., nothing else in the record describes the sale. No evidence touched upon the number of cattle sold, the similarities, if any, between the livestock owned by Charles N. to that of the other sellers, or the number of buyers and sellers present. Nor did anyone attempt to describe the components of the actual sale. Whether neutral market forces, as opposed to competitive bidding, dictated the ultimate sales price went undeveloped as did the availability of price quotations established by comparable sales or even the commodities market.[10] In other words, there is not a scintilla of evidence revealing whether the Graham Auction satisfied the prerequisites of a recognized market or whether the collateral sold was of the type customarily sold through such a market.

■■■ That the trial judge purported to take judicial notice that cattle are normally sold in Cottle County, Texas, through livestock auction commission merchants does nothing to fill the void. Before a fact can be judicially noticed, it must be verifiably certain and relatively indisputable. *Furr's Supermarket, Inc. v. Williams*, 664 S.W.2d 154, 157–58 (Tex.App.—Amarillo 1983, no writ). The circumstances surrounding and market factors influencing a local cattle auction conducted by a "livestock auction commission merchant" are hardly facts within that category. They would undoubtedly vary from situation to situation depending upon the type and quality of the cattle involved, the number of bidders present, the order of sale, the ability of the auctioneer, and the personal whims of each bidder. Simply put, the presence or absence of a recognized market at bar was not something of which the trial judge could judicially note. So the court's attempt to do so cannot be considered as any evidence on the subject.

Finally, FNB cannot escape its duty to prove commercial reasonableness or prior notice by contending that it did not sue for a deficiency. By the time the cause was called for trial, the bank had repossessed and sold portions of the collateral. The proceeds garnered were used to reduce the outstanding balance due from Charles N. This placed it in the position of suing for a deficiency judgment. *See Gordon & Assoc., Inc. v. Cullen Bank/Citywest, N.A.*, 805 S.W.2d 490, 492 (Tex.App.—Corpus Christi 1990, no writ) (holding that the bank sued for a deficiency at the time of trial since "offsets must be made prior to judgment" even though none existed before suit was filed).

Consequently, we also sustain points of error two, six and eight but overrule point seven.

### Points of Error Three and Four

■■■ In points three and four, Charles N. contends that FNB could not recover any deficiency since it retained possession of farm equipment collateral in complete satisfaction of the debt or because it had to dispose of that collateral before trial. The argument here proposed is one suggesting that FNB elected or had to elect its particular remedy. *See Tanenbaum v. Economics Lab., Inc.*, 628 S.W.2d at 771 (stating that the combination of sections 9.504 and 9.505 of the Texas Business and Commerce Code "put the creditor to an election to either sell ... or to retain the collateral"). Furthermore, its nature is one of estoppel, *Davis v. Houston Independent Sch. Dist.*, 654 S.W.2d 818, 820 (Tex.App.—Houston [14th Dist.] 1983, no writ) (stating that election of remedies is a

---

difficult to prove that the market through which they are sold is akin to a commodity or stock exchange or that it satisfies the criteria of a recognized market.

**10.** Indeed, the word "auction" itself connotes competitive bidding. *See The American Heritage Dictionary of the English Language* (College Edition 1976) (defining "auction" as a public sale in which property or items of merchandise are sold to the *highest bidder*).

doctrine of estoppel); *Deal v. Madison,* 576 S.W.2d 409, 425 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.) (stating the same), and constitutes "an avoidance or affirmative defense." *Tex.R.Civ.P.* 94. Thus, to raise it at trial, it must be specifically pled by the claimant. *Deal v. Madison,* 576 S.W.2d at 425. Yet, the answers of Charles N. or the other appellants mention nothing of it. Thus, it was waived and we overrule the two points.

## Conclusion

Having sustained points two, five, six, and eight, we also sustain points nine and ten. Until FNB proves that it could pursue a deficiency judgment, FNB was not entitled to an order enforcing such a recovery via a rescission of the transfer of realty between Charles N., Vera, and Charles B. or directing foreclosure upon that very same realty.

Accordingly, there being reversible error in the judgment and in the interests of justice, we reverse the judgment and remand the cause for new trial.