# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-01-00098-CV

**Joe M. Baragas and Randall McLerran, Appellants**

**v.**

**Coupland State Bank, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
## NO. 99-09802, HONORABLE W. JEANNE MEURER, JUDGE PRESIDING

This is an appeal from a judgment awarding deficiency balances remaining on four bank loans. The judgment is against the guarantors of the debts who complain that the bank's disposition of the foreclosed collateral violated section 9.504(c) of the Texas Business and Commerce Code in that the sales were not conducted in a commercially reasonable manner and with sufficient prior notice to the guarantors. We conclude that the sales were conducted in a commercially reasonable manner. We hold that there was sufficient notice of the private sales, but that there was insufficient notice of the public sales. Nevertheless, because only a small portion of the sales were defective and the various pieces of equipment sold cannot be traced back to each specific loan, it would be manifestly unjust to deny the bank judgment for the deficiency. We therefore affirm the judgment of the district court.

Appellants, Joe M. Baragas and Randall McLerran, are the guarantors of promissory notes executed by Metro Paving Company ("Metro") for the purchase of heavy equipment for its paving business.[1] Metro borrowed a total of $450,025 from Coupland State Bank (the "Bank") and granted the Bank security interests in the equipment. Baragas and McLerran (collectively, "Guarantors") personally guaranteed those debts. Metro defaulted on its notes and the Bank filed suit to foreclose and seize the collateral. The Bank seized as much of the equipment as could be located and held it through sequestration proceedings. The Bank obtained a judgment against Metro which directed the sheriff to turn over to the Bank the sequestered equipment. The Bank subsequently sold various pieces of the equipment and then filed this lawsuit to collect the deficiencies under the notes through the guarantees. Following a bench trial, the court rendered judgment for the Bank.[2]

## FACTUAL BACKGROUND

This case arises out of a series of loans made by the Bank in 1998 and 1999 to Metro that were personally guaranteed by Baragas and McLerran. The Bank's loans were secured by Metro's accounts receivable, inventory, machinery and equipment. Metro defaulted on all loans. The

---

[1] Baragas and McLerran are the sole shareholders and officers of Metro. Baragas owns fifty-one percent of the corporation and is the president and McLerran owns forty-nine percent and is the treasurer.

[2] The judgment awarded the Bank the principal amount of $294,591.79, prejudgment interest of $51,180.37, attorney's fees of $11,250.00, post-judgment interest at 18%, and costs of court. It is impossible to determine from the record how the court and the parties determined that the principal was $294,591.79. However, it is undisputed that $294,591.79 presents the balance remaining on the notes after all offsets are applied, including amounts from the sales of collateral and the remaining marketable equipment in Guarantors' possession.

2

Bank accelerated the loans and sued Metro. During that suit, the Bank obtained a writ of sequestration for the paving equipment.[3] The sheriff seized pieces of equipment from Metro's premises and jobs-in-progress, but not all of the equipment could be located. Guarantors would not reveal its whereabouts. The sheriff's seizure apparently took more than one day. Several pieces of heavy equipment disappeared overnight before the sheriff could seize them. Guarantors did not file a police report regarding the disappearance.

The equipment seized was taken to Anton Equipment and held there by the sheriff during the pendency of the suit. The Bank's claims were reduced to judgment on January 31, 2000. In addition to awarding the Bank principal, interest and attorney's fees, that judgment also provided:

> It is further ADJUDGED that the security interest of Coupland State Bank, Plaintiff, in the property still in the possession of the Defendant named in Exhibit "A" is foreclosed; that an order of sale shall issue to any sheriff or any constable in the state [sic] of Texas, directing him to seize and sell the collateral as under execution, in satisfaction of this judgment and that, if the collateral cannot be found or if the proceeds of the sale are insufficient to satisfy the judgment, the officer shall take the

---

[3] Sequestration is an extraordinary pre-judgment writ whereby property in dispute in a lawsuit may be seized and held by the sheriff until it is sold, replevied or turned over as ordered by the court. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 62.001-.063 (West 1997); Tex. R. Civ. P. 696-734. Sequestration proceedings are available when the suit is for possession or foreclosure of personal property which is in immediate danger of being concealed, ill-treated, wasted, destroyed or concealed. Tex. Civ. Prac. & Rem. Code Ann. § 62.001(a). Sworn pleadings and a bond are required. *Id*. § 62.022; Tex. R. Civ. P. 696-98. The defendant is required to be served with the writ, Tex. R. Civ. P. 700a, and has the opportunity to have the property returned during pendency of the suit by posting a replevy bond to prevent wasting or destruction of the property. Tex. R. Civ. P. 701-04. While the property is in the sheriff's possession, the sheriff is obliged to "care for and manage in a prudent manner the sequestered property." Tex. Civ. Prac. & Rem. Code Ann. § 62.061. During that time, the party securing the writ has no right to disturb the sheriff's possession of the property. *Tolbert v. McSwain*, 137 S.W.2d 1051, 1054 (Tex. Civ. App.—El Paso 1939, no writ).

money, or any balance thereof remaining unpaid, out of any property of Metro Paving Company, Inc., Defendant, as in the case of ordinary executions.

It is further ORDERED that the property that was sequestered by the Sheriff under the Writ of Sequestration named in Exhibit "A" is foreclosed and that the Sheriff is ordered to release the property to the Plaintiff and the Sheriff is released of all liability hereafter as to that property.

It is ORDERED that Plaintiff shall have all writs of execution and other process necessary to enforce this judgment.

Texas Rule of Civil Procedure 239a requires notice of judgment be given by the clerk of the court to all parties or their counsel.[4] Guarantors do not contend that they lacked notice of that judgment.

The Bank was unable to locate the remaining equipment or Metro's accounts receivable. On March 29, 2000, the Bank obtained a turnover order directing Metro to turn over to the Bank the remaining equipment and accounts receivable. No property was surrendered.

Pursuant to the judgment, the property that had been seized was turned over to the Bank's custody, but it remained at Anton Equipment. The Bank engaged Bruce Anton, who was qualified at trial as an expert in the selling of used heavy equipment, to appraise the equipment and advise how to obtain the highest amount possible for it. Anton recommended that the Bank first attempt to sell each piece of equipment privately by advertising in an industry publication with wide circulation, the *Heavy Equipment Trader*; he then recommended selling any remaining pieces at public auction.

---

[4] Metro was represented by the same counsel in the Bank's foreclosure suit as Guarantors are in the instant deficiency suit.

The Bank followed Anton's advice and proceeded to liquidate the equipment beginning in February 2000. It ran advertisements for the equipment in several editions of the *Heavy Equipment Trader*. The Bank received several inquiries and bids for the advertised equipment; it accepted the highest bids. In total, the Bank received $91,000 from private sales by virtue of the advertisements in the *Heavy Equipment Trader*.

The equipment that did not sell through the magazine was put up for sale at public auction. Gaston & Sheehan Auctioneers was selected because it was the largest and best known auction house in central Texas. Gaston & Sheehan Auctioneers sent notice of the auction to approximately 2,500 to 3,000 potential buyers, and advertised in the town newspaper. The equipment had to be hauled to the auction house because none of it was operative. On the day of the auction, there were between 250 to 300 people in attendance. The auctioneer testified that there were at least three or four paving company owners present at the auction.

Other than the auction commission, the Bank did not charge to Guarantors the expenses it incurred in selling the equipment. The Bank's president, the appraiser, and two auctioneers all testified about the poor condition of most of the equipment when it was seized. The motorized equipment would not start. Many pieces had missing engines, drive trains, transmissions or other parts. Some of the earth-moving equipment was caked in dirt and vegetation. All of the equipment was old and had deteriorated. The documentary evidence shows that the total sum generated by the public auction was $10,350.

**DISCUSSION**

Guarantors contend the Bank is not entitled to recover any deficiency by virtue of sections 9.504(c) and 9.505 of the Texas Business and Commerce Code[5] because the Bank: (1) failed to dispose of the collateral in a commercially reasonable manner, (2) failed to give Guarantors prior notice of the disposition of collateral, and (3) retained part of the collateral, thereby waiving any deficiency. Guarantors requested and the district court filed findings of fact and conclusions of law. On appeal, however, Guarantors do not attack specific findings of fact or conclusions of law. Their issues on appeal are expressed generally. Because they do not specify whether they are attacking the legal or factual sufficiency of the evidence, we review both the legal and factual sufficiency of the relevant findings.

### *Standard and Scope of Review*

Findings of fact in a case tried to the court have the same force and effect as a jury verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Starcrest Trust v. Berry*, 926 S.W.2d 343, 352 (Tex. App.—Austin 1996, no writ). Likewise, findings of fact are reviewable for factual and legal sufficiency according to the same standards as jury findings. *Catalina*, 881 S.W.2d at 297; *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex. 1989). However, a court's conclusions of law are accorded *de novo* review. *Asai v. Vanco Insulation Abatement, Inc.*, 932 S.W.2d 118, 121 (Tex. App.—El Paso 1996, no writ).

---

[5] All statutory references are to the Texas Business and Commerce Code unless otherwise indicated.

6

"No evidence" challenges are reviewed by considering only the evidence and inferences tending to support the finding and disregarding all evidence and inferences to the contrary. *Middleton v. Kawasaki Steel Corp.*, 687 S.W.2d 42, 44 (Tex. App.—Houston [14th Dist.] 1985, writ ref'd n.r.e.). If there is more than a scintilla of evidence to support the finding, then the "no evidence" challenge must fail. *Catalina*, 881 S.W.2d at 297. Factual sufficiency challenges are reviewed by considering all the evidence in the record and a finding will not be set aside unless the evidence tending to support it is so insufficient or contrary evidence is so overwhelming so as to be manifestly unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634-35 (Tex. 1986).

### *Equipment Not Sold on "Recognized Market"*

The Bank contends that this case is not governed by section 9.504(c) because the collateral involved is of a type customarily sold on a "recognized market." It presented evidence that the heavy equipment magazine and the auction were "recognized markets," and were, therefore, exempt from the requirements of section 9.504(c). The district court concluded that the collateral in question fell within the exception to the statute.

Section 9.504(c)[6] provides in relevant part:

---

[6] In 1999, Texas became one of the first states to enact the revised Article 9 (secured transactions) drafted by the National Conference of Commissioners on Uniform State Laws. *See* Act of June 18, 1999, 76th Leg., R.S., ch. 414, § 1.01, 1999 Tex. Gen. Laws 2639; John Krahmer, *Commercial Transactions*, 53 SMU L. Rev. 729, 758 (2000). Because these revisions took effect July 1, 2001, they do not affect cases filed before that effective date and, therefore, do not apply to the instant case which was filed on August 23, 1999. Act of June 18, 1999, 76th Leg., R.S., ch. 414, § 3.01, 1999 Tex. Gen. Laws 2747. The revisions also made substantive changes to section 9.504 of the Texas Business and Commerce Code, as well as assignment of a new section number of 9.611. *See* footnote 12, *infra*.

Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. *Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor*, if he has not signed after default a statement renouncing or modifying his right to notification of sale.

Act of Aug. 28, 1967, 60th Leg., R.S., ch. 785, § 9.504, 1967 Tex. Gen. Laws 2550, *amended by* Act of June 18, 1999, 76th Leg., R.S., ch. 414, § 1.01, 1999 Tex. Gen. Laws 2724. (Emphasis added.)

Metro's paving equipment was not perishable and would not decline rapidly in value. The district court concluded that the equipment was the type sold on a recognized market. Conclusion of Law 6 states that the property was "of a type customarily sold on a recognized market and no notice was required to be given." The court concluded that the paving equipment fell within an exception to the notice requirement of section 9.504(c). We conclude that the district court's conclusion regarding a "recognized market" is erroneous.

Although the statute does not define the term "recognized market," it has been interpreted in case law. The case of *O'Neil v. Mack Trucks, Inc.*, 533 S.W.2d 832 (Tex. Civ. App.—El Paso 1975), *rev'd on other grounds*, 542 S.W.2d 112 (Tex. 1976), is instructive. There, a creditor repossessed thirteen trucks, sold them in a private sale and sued the debtor for the deficiency. *Id.* at 836. The creditor failed to give the debtor notice of any kind. *Id.* The creditor then sought to uphold the sale as coming within the exception in section 9.504(c) for goods typically

8

sold on a recognized market. *Id.* The court rejected that notion and explained that a "recognized market"

> within the meaning of the U.C.C. is most restrictive. Cases which have considered "used cars" are authority for this ruling. "Thus a 'recognized market' might well be a stock market or a commodity market, where sales involve many items so similar that individual differences are nonexistent or immaterial, where haggling and competitive bidding are not primary factors in each sale, and where the prices paid in actual sales of comparable property are currently available by quotation."

*Id.* If a transaction involves negotiations or competitive bidding, it is not one conducted on a recognized market where market forces rather than individual negotiations between buyer and seller determine price. *M.P. Crum Co. v. First Southwest Sav. & Loan Ass'n*, 704 S.W.2d 925, 927 (Tex. App.—Tyler 1986, no writ). Examples of collateral "customarily sold on a recognized market" are publicly traded stocks and bonds. *See, e.g., Federal Deposit Ins. Corp. v. Blanton*, 918 F.2d 524, 528 (5th Cir. 1990) ("the markets at issue here – the New York Stock Exchange and the New York Bond Exchange – comfortably fit the paradigm. Courts . . . agree that securities markets properly fall within the exception"). "Recognized markets" are excepted from the requirements of section 9.504(c) because they are believed to assure "a fair price through neutral market forces" which "obviate the debtor's need for protection through redemption, appraisal, or monitoring the sale." *Id.* at 527-28.

The collateral in this case included assorted motorized vehicles such as pick-up trucks, dump trucks, a tractor-truck and trailer, pavers, rollers and other heavy equipment. Like trucks and used cars, Metro's used pieces of heavy equipment are not fungible. Individual differences and defects are crucial in determining the price of each item. Negotiations and competitive bidding were

9

clearly involved in the actual sales of this equipment. We find as a matter of law that the paving equipment involved in this case was not "of a type customarily sold on a recognized market." Consequently, for the sale to be lawful, the disposition of the paving equipment by the Bank must have been commercially reasonable and done pursuant to reasonable notice.[7]

### *Sales Commercially Reasonable*

Commercial reasonableness is determined by the method, manner, time, place and terms of the sale. *Blanton*, 918 F.2d at 529. Factors to be considered are (i) whether the creditor endeavored to obtain the best possible price, (ii) whether the collateral was sold in bulk or piecemeal, (iii) whether it was sold in a private or public sale, (iv) whether it was available for inspection prior to sale, (v) whether it was sold at a propitious time, and (vi) whether the expenses of the sale were reasonable and necessary. *Havins v. First Nat'l Bank*, 919 S.W.2d 177, 181 (Tex. App.—Amarillo 1996, no writ).

Just because collateral could have fetched a higher price by sale at a different time and method does not evidence a lack of commercial reasonableness. Act of Aug. 28, 1967, 60th Leg., R.S., ch. 785, 1967 Tex. Gen. Laws 2552 (amended 1999). If the collateral is "otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold," it is considered to have been disposed of in "a commercially reasonable manner." *Id*.

---

[7] Section 9.504(c) does apply to guarantors such as Baragas and McLerran. It is well settled that the term "debtor" used in section 9.504 includes any guarantors or other secondary obligors of the debt in question. *Peck v. Mack Trucks, Inc.*, 704 S.W.2d 583, 585 (Tex. App.—Austin 1986, no writ); *Hernandez v. Bexar County Nat'l Bank*, 710 S.W.2d 684, 687 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.).

There is ample evidence in the record to establish that the sales of the equipment were commercially reasonable. The seized equipment was available for inspection during all relevant times. The Bank had the equipment appraised by an expert in used heavy equipment sales. The pieces were offered for sale during spring and summer which are peak periods in the paving industry. The equipment was advertised in a widely disseminated trade publication. Only the highest bids were accepted. Written bids were required and the Bank's board of directors approved the private sales. The public auction was conducted by the largest auction house in town. It was well-advertised and well-attended.

The Bank produced documentation of the appraisal, magazine advertisements, auction announcements and advertisements, written bids, bills of sale, statement of items sold, commissions and taxes. The sales were each thoroughly documented. The Bank did not charge its expenses of sale to Guarantors, except for the auctioneer's commission.

The evidence was conflicting on the issue of the condition of the various pieces of equipment when they were seized by the sheriff. Guarantors each testified that the equipment had been well-maintained. They said that it was all in good shape and in use when it was seized. On the other hand, the Bank officer, the Bank's heavy equipment expert, and two auctioneers testified that the equipment had been neglected and poorly maintained. When it was seized, the Bank president testified that the equipment was in very poor condition; most of the pieces were inoperative. Some could be used only for parts. The Bank repaired one large expensive item, but it was not economically feasible to repair other pieces.

A significant portion of the property was not in the Bank's possession. McLerran admitted that some of the equipment was still located in Metro's yard, that the Bank had requested that it be turned over and that he had refused to do so because the Bank wanted to conduct a public auction on Metro's property. He also admitted that numerous items of equipment were "missing." The district court estimated that the collateral still in Metro's possession could be sold for $47,000. The court's findings of fact and conclusions of law indicate that an offset was given for the $47,000 in calculating the amount of the deficiency awarded the Bank. Guarantors do not challenge these findings.

Guarantors presented no expert testimony, only their own opinions about value. "[T]he fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner." Act of Aug. 28, 1967, 60th Leg., R.S., ch. 785, § 9.507, 1967 Tex. Gen. Laws 2552 (amended 1999). We conclude that there is sufficient evidence in the record to show that the Bank's sale of the collateral was done in a commercially reasonable manner.

***Reasonable Notice of Disposition***

Although the sales were commercially reasonable, section 9.504(c) further required the Bank to have given Guarantors reasonable notice prior to the sales. *Tanenbaum v. Economics Lab., Inc.,* 628 S.W.2d 769, 772 (Tex. 1982) ("We hold that in order for a creditor in a secured transaction to sue for a deficiency after disposition of collateral in a commercially reasonable manner, he must first comply with those provisions of Section 9.504 which require giving notice to the

12

debtor."). Because the Bank chose to sell the collateral, the requirements of section 9.504 applied. *See Riyad Bank v. Gailani*, No. 00-0688, slip op. at 10, 2001 Tex. LEXIS 103, at \*4 (Tex. Nov. 8, 2001). This means that a secured party must "take reasonable steps to notify the debtor." *MBank Dallas N.A. v. Sunbelt Mfg., Inc.*, 710 S.W.2d 633, 635 (Tex. App.—Dallas 1986, writ ref'd n.r.e.). Guarantors contend that the Bank failed to give them notice of the sales and that the failure prohibits a deficiency judgment against them.[8]

An official comment, Comment 5, to section 9.504 states that a debtor must have enough notice to be able to take appropriate steps to protect his interests by taking part in the sale if he chooses. Act of Aug. 28, 1967, 60th Leg., R.S., ch. 785, § 9.504 cmt. 5, 1967 Tex. Gen. Laws 2552 (amended 1999); *see also Morgan v. Amarillo Nat'l Bank*, 699 S.W.2d 930, 935 (Tex. App.—Amarillo 1985, writ ref'd n.r.e.). However, the Code's use of the term "reasonable" means less than perfect notice is required. *Siboney Corp. v. Chicago Pneumatic Tool Co.*, 572 S.W.2d 4, 6 (Tex. Civ. App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.). Section 9.504(c) requires the secured creditor to take reasonable steps to notify the debtor, and reasonable does not mean full and complete notice. *See MBank*, 710 S.W.2d at 636; *Siboney Corp.*, 572 S.W.2d at 6 ("notice was sufficient to inform reasonable business persons of the place of the sale").

---

[8] A debtor must affirmatively plead the defense of lack of commercial reasonableness, *Greathouse v. Charter Nat'l Bank-Southwest*, 851 S.W.2d 173, 177 (Tex. 1992), and reasonable notice. *See Ford Motor Credit Co. v. Bright*, 34 F.3d 322, 324 (5th Cir. 1994) (interpreting Texas law). The Bank, however, did not plead that all conditions precedent to the bringing of this suit for deficiency had been satisfied. It is such a pleading by a creditor that triggers the necessity for the debtor to affirmatively plead these defenses. *Greathouse*, 851 S.W.2d at 177. Guarantors were not, therefore, put to the burden of affirmatively pleading these defenses.

The Code requires only notice that enables the debtor to protect his interest in the collateral. *MBank*, 710 S.W.2d at 636. Oral notification can be sufficient to satisfy section 9.504(c). *Id*. at 637. Actual knowledge of the sale by the debtor also satisfies the notice requirement. *See id.* at 636. The notice need not specify whether the disposition will be by public or private sale. *Hall v. Crocker*, 737 S.W.2d 1, 3 (Tex. App.—Houston [14th Dist.] 1987, writ denied).

For a private sale, section 9.504(c) requires notice of the "time after which any private sale" will take place. *Federal Deposit Ins. Corp. v. Lanier*, 926 F.2d 462, 465 (5th Cir. 1991). A creditor is not required to give notice every time a "possible private sale nears fruition." *Id*. at 466 (quoting 2 White & Summers, *Uniform Commercial Code* § 27-12 at 605 (3d ed. 1988)). On the other hand, a public sale requires notice of date, time and place of the sale be given to the debtor. Act of Aug. 28, 1967, 60th Leg., R.S., ch. 785, § 9.504, 1967 Tex. Gen. Laws 2550 (amended 1999) (current version at Tex. Bus. & Com. Code Ann. § 9.611 (West Supp. 2001)); *Lanier*, 926 F.2d at 466.

### Notice Not Applicable to Judicial Dispositions

The Bank urges us to apply another exception to section 9.504(c). It argues that the prior sequestration and judgment against Metro effected a judicial disposition of the collateral to which section 9.504 should not apply. While we agree that a judicial disposition of collateral is not subject to the requirements of section 9.504,[9] we do not believe that the sales of the collateral in this

---

[9] *See, e.g.*, *Maryland Nat'l Bank v. Traenkle*, 933 F. Supp. 1280, 1287 (D. Md. 1996); *Dakota Bank & Trust Co. v. Reed,* 402 N.W.2d 887, 892 (N.D. 1987) (holding that bank's obtaining judgment on debt and execution by sheriff's levy and sale "was a non-Code alternative to the Bank. Consequently . . . the notice and commercial reasonableness requirements of [9.504] did not apply to this procedure"); *Bilar, Inc. v. Sherman*, 572 P.2d 489, 492 (Colo. Ct. App.1977); *Roebuck v.*

case can be fairly characterized as "judicial." The initial seizures of the paving equipment were accomplished through judicial proceedings. However, the January 31, 2000 judgment ordered the sheriff to release the seized equipment to the Bank. The various sales were conducted after the property was turned over to the Bank. The sales were not conducted under the auspices of the court or any court-appointed officer. They were not subsequently approved by any court.

Although the debt was reduced to judgment, Guarantors were still potentially liable for any deficiency after the Bank's disposition of the collateral. In order for these sales to have been exempt from the requirements of section 9.504(c), the actual sale of collateral must have been conducted under the supervision of a court or court-appointed officer or subsequently reviewed and approved by a court. We hold that, on these facts, the Bank's sales in this case do not qualify as judicial dispositions.

### January 31, 2000 Judgment Constituted Notice of Private Sale

We do, however, consider the January 31, 2000 judgment to have satisfied the notice requirement for a private sale. Guarantors were the officers and sole shareholders of Metro so they had notice of the judgment against Metro. McLerran admitted actual knowledge of the January 31, 2000 judgment against Metro. Guarantors had written notice that, after January 31, 2000, the

---

*Walker-Thomas Furniture Co.*, 310 A.2d 845, 848 n.9 (D.C. 1973); *Owens v. First Commonwealth Bank*, 706 S.W.2d 414, 416 (Ky. Ct. App. 1985); *C & T Recreation, Inc. v. Cannon Minnesota*, 367 N.W.2d 591, 594 (Minn. Ct. App. 1985); *Flickinger Co., Inc. v. 18 Genesee Corp.*, 423 N.Y.S.2d 73, 75 (N.Y App. Div. 1979); *Farmers State Bank of Afton v. Ballew*, 626 P.2d 337, 339 (Okla. 1981); *see also* White & Summers, *Uniform Commercial Code* § 26-4, at 1092-93 (2d ed. 1981). This exception is generally considered to apply to sales conducted by court-appointed receivers or trustees. *Couch v. Borg-Warner Acceptance Corp.*, 543 So.2d 370 (Fla. Dist. Ct. App. 1989); *Sands v. Citizens & Southern Nat'l Bank*, 247 S.E.2d 544, 545 (Ga. Ct. App. 1978); *Executive Bank v. Tighe*, 429 N.E.2d 1054, 1057 (N.Y. 1981).

collateral would be turned over to the Bank for disposition. Guarantors are sophisticated commercial actors. We conclude that actual notice of the January 31, 2000 judgment constitutes notice that the collateral would be sold after being turned over to the Bank.[10]

The facts of this case are distinguishable from those in *Tanenbaum*. In that case, the debtor voluntarily returned the collateral, which the creditor then retained for an inordinately long period. 628 S.W.2d at 770. The creditor eventually decided the collateral was worthless and scrapped it. *Id.* The debtor was not advised of the creditor's estimation of the collateral's value or its decision to destroy it. *Id.* at 770, 772. The creditor sued the debtor for a deficiency. *Id.* at 772. The supreme court concluded that because the creditor had unilaterally destroyed the collateral without notice, the debtor was wrongfully deprived of an opportunity to have the collateral appraised in order to rebut the creditor's estimation of value. *Id.*

Here, the collateral was sequestered by the sheriff from August 1999 until February 2000. None of the equipment was sold until February 2000. The equipment remained at Anton Equipment even after the sheriff turned over control of it to the Bank. In fact, the equipment was not moved from that location until a few days before the May 20, 2000 auction. Guarantors had ample time to obtain independent appraisals of the equipment, bid on the items themselves or have "friendlier" purchasers bid on them. Instead, Guarantors did nothing to protect their interests in the equipment.

---

[10] The United States Court of Appeals for the Fifth Circuit observed in *Lanier* that "guarantors would have us require the bank to notify them more explicitly of something that they should have known from reading the law, rereading the original contract, or by consulting common sense." *Federal Deposit Ins. Corp. v. Lanier*, 926 F.2d 462, 466 (5th Cir. 1991).

Based on all the evidence in the record along with all reasonable inferences therefrom, we find that there is factually sufficient evidence that Guarantors had sufficient notice of the date after which the collateral would be disposed of by private sale so as to satisfy section 9.504(c).

**The Public Sales**

On the other hand, the January 31, 2000 judgment did not contain sufficient information to satisfy the notice requirements for a public sale, *i.e.*, date, time and place of sale. Reviewing the record under the appropriate standards of review, we find that there is neither factually nor legally sufficient evidence to establish that the Bank gave Guarantors sufficient notice of the public sale of the collateral within the meaning of section 9.504(c).

The issue now becomes the appropriate consequence of the Bank's failure to provide Guarantors sufficient notice of the May 20, 2000 public sale of collateral  We do not think that this relatively minor procedural defect justifies depriving the Bank of any deficiency and reversing this judgment.

Again, the *Tanenbaum* case cited by Guarantors is distinguishable from this case.  In *Tanenbaum*, the supreme court decided that a creditor's failure to give sufficient notice under section 9.504(c) prevented the creditor from recovering a deficiency.  628 S.W.2d at 772.  The circumstances in this case are distinct from those in *Tanenbaum*.  There, the debtor had no prior indication that the creditor would urge a deficiency claim because of the length of time the creditor retained the collateral without notice. *Id.*  Moreover, the debtor never had a reasonable opportunity to obtain proof of the collateral's true value in order to rebut the creditor's claim to a deficiency. *Id.*

17

In this case, the collateral was disposed of through two different methods or types of sales, only one of which was defective. Unlike *Tanenbaum*, the Bank did not "scrap" the collateral or otherwise make it unavailable for appraisal when the Bank sued for a deficiency. Guarantors in this case had some five months where the collateral was sequestered by the sheriff. They could have posted a replevy bond or inspected and appraised the collateral. McLerran knew that the equipment was at Anton Equipment because Bruce Anton called him inquiring about how to start one of the engines. McLerran knew where Anton's yard was located because he had been there "half a dozen times." The Bank did not sit on its rights; rather, it vigorously pursued collection efforts from the start. Guarantors were not lulled into thinking that the Bank elected to retain equipment in complete satisfaction of the debt. The Bank could not even locate and gain access to all of the collateral.

Having concluded that the January 31, 2000 judgment gave Guarantors sufficient notice of the private sales, it would be manifestly unfair to hold that the Bank is precluded from collecting any deficiency simply because it did not give proper notice regarding the public sale of a relatively small amount of the collateral. Only five items were sold at the public auction. One of the vehicles could not be sold because Guarantors still retained title. The Bank realized only $10,350 from the public auction, whereas the private sales garnered $91,000.[11]

Guarantors failed to demonstrate that the Bank's public sale of collateral, which garnered only $10,350, was commercially unreasonable. Moreover, the district court's judgment fully credited Guarantors in that amount. In view of these unique facts, the Bank should not be barred

---

[11] These figures are based on this Court's calculations from the bills of sale and statements contained in the record, which inexplicably differ from those of the parties. This opinion employs only figures with support in the documentary evidence.

from collecting a deficiency when Guarantors had sufficient notice of the more successful private sales.[12]  Guarantors would receive a windfall should the Bank be totally deprived of collecting a deficiency.  Guarantors should not be rewarded for any conduct that minimizes or destroys the value of the collateral.  Accordingly, we conclude that the procedural defect in the public auction was not sufficiently harmful to cause reversal of the deficiency judgment.  *See, e.g., Piney Point Inv. Corp. v. Photo Designs, Inc.*, 691 S.W.2d 768, 770 (Tex. App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.).

***Collateral Not Retained Under Section 9.505***

Guarantors also urge us to conclude that the Bank is prohibited from obtaining any deficiency because the Bank elected to retain portions of the collateral under section 9.505(b) thereby waiving entitlement to any deficiency.  *See Tanenbaum*, 628 S.W.2d at 772.  They further urge us to rule that the Bank "retained" items of collateral that are still in their own possession and control.  Section 9.505(b) provides in relevant part:

---

[12]  In *Tanenbaum*, the supreme court opted for a complete bar against an offending creditor collecting a deficiency and rejected the concept of a rebuttable presumption.  *Tanenbaum v. Economics Lab., Inc.*, 628 S.W.2d 769, 771 (Tex. 1982).  The latter theory presumes that the value of the collateral on the date of repossession is equal to the amount of the debt (obviating a deficiency), unless the creditor proves that the amount realized from the actual sale of the collateral was less than the amount of the debt.  *Id*.  The Legislature subsequently overruled *Tanenbaum*'s complete bar rule, at least with respect to non-consumer goods.  Tex. Bus. & Com. Code Ann. § 9.626(a)(3), (4) (West Supp. 2001).  The 1999 legislative changes effectively adopt the rebuttable presumption theory.  Sections 9.626(a)(3) and (4) provide that if a creditor fails to prove that it complied with Article 9 in the disposition of the non-consumer collateral, then the liability of the debtor for a deficiency is limited to an amount by which the debt, expenses and attorney fees exceed the amount, that was actually collected or that should have been collected from the disposition of the collateral.  *Id*.

In any other case involving consumer goods or any other collateral a secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if he has not signed after default a statement renouncing or modifying his rights under this subsection. . . . If the secured party receives objection in writing from a person entitled to receive notification within twenty-one days after the notice is sent, the secured party must dispose of the collateral under Section 9.504. In the absence of such written objection the secured party may retain the collateral in satisfaction of the debtor's obligation.

Act of Aug. 28, 1967, 60th Leg., R.S., ch. 785, § 9.505, 1967 Tex. Gen. Laws 2551 (amended 1999).

There was testimony that the Bank sought to obtain those items still in Guarantor's possession, but could not gain access to their premises. Guarantors dispute that allegation. Nevertheless, it is uncontroverted that the Bank has not had possession of or control over that collateral. In no sense did the Bank "retain" that collateral. Likewise, we will not hold that the pieces of equipment that "disappeared" from Metro's premises during the night were "retained" by the Bank.

Finally, it is also clear from the record that, other than the equipment that was missing while in Guarantors' possession, the remainder is essentially worthless. The only items of collateral in the Bank's possession are those items which did not sell in either the private or public sales. The reason the Bank wanted to conduct the auction on Metro's premises was because the cost of hauling the remaining equipment to another location would substantially exceed its value. Guarantors argue that the Bank's failure to haul the equipment away and dispose of it requires the forfeiture of the entire deficiency. We disagree. There is overwhelming evidence that the Bank took reasonable steps to obtain and sell all of the collateral. The inability to dispose of the remaining collateral was due to

20

Metro's neglect and waste of the equipment, Guarantors' refusal to cooperate in turning over the equipment and the disappearance of equipment while under their control.[13]

We hold that the Bank did not retain any portion of the collateral within the meaning of section 9.505(b). In Finding of Fact 24, the court found that the value of the remaining equipment in Guarantors' possession, which could be sold, was $47,000 and the judgment credited Guarantors in that amount. Guarantors do not challenge this finding. They argue only that the Bank's retention of collateral prevents its collection of any deficiency.

## CONCLUSION

Having overruled Guarantors' issues on appeal, we affirm the judgment of the district court.

 

Jan P. Patterson, Justice

Before Chief Justice Aboussie, Justices Yeakel and Patterson

Affirmed

Filed: November 29, 2001

Do Not Publish

---

[13] The appraised value of the six pieces of equipment that disappeared total $18,000.