TEX STAR MOTORS, INC., Appellant,

v.

REGAL FINANCE COMPANY, LTD. and Regal Finance Company II, Ltd., Appellees.

No. 14–05–00215–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 10, 2008.

Eugene B. Wilshire, Jr., Jacalyn D. Scott, Elaine A. G. Carlson, Houston, for appellant.

David J. Beck, Russell S. Post, Michael Ernest Richardson, David M. Gunn, Constance H. Pfeiffer, Erin Hilary Huber, Houston, for appellees.

Panel consists of Justices ANDERSON, HUDSON, and EDELMAN.*

## SUBSTITUTE OPINION

RICHARD H. EDELMAN, Senior Justice (Assigned).

Appellees' motions for rehearing and for en banc reconsideration are overruled, the opinion issued in this case on July 19, 2007 is withdrawn, and the following opinion is issued in its place.

In this breach of contract dispute, Tex Star Motors, Inc. ("Tex Star") appeals a judgment entered in favor of Regal Finance Company, Ltd. and Regal Finance Company II, Ltd. (collectively, "Regal") on the grounds that: (1) the trial court erred in failing to award Tex Star recovery in accordance with the portions of the jury's verdict decided in its favor; (2) the charge submitted to the jury was defective in numerous respects; (3) the evidence was legally and factually insufficient to support the jury's findings in favor of Regal; (4) the trial court erred in making a joint

* Senior Justices Harvey H. Hudson and Rich- ard H. Edelman sitting by assignment.

award of attorney's fees to Regal and in awarding attorney's fees without evidence of segregation between claims, defenses, and parties; and (5) the trial court improperly awarded prejudgment interest for a period before Regal's loss accrued. We affirm as modified in part, and reverse and remand in part.

## Background

Beginning in 1996, Tex Star, a used vehicle dealer, and Regal, an investment partnership, entered into two Retail Installment Contract Purchase and Sales Agreements (the "PSAs"), under which Regal had the right to purchase all of the secured automobile installment loan notes (the "notes") that Tex Star received in sales transactions with its customers. The PSAs provided for a "holdback reserve" fund in which Regal would retain $750 of the price of each note it purchased to reimburse it for: (1) deficiencies, collateral repossession expenses, and other debts owed to Regal by Tex Star; and (2) a specified amount (the "repurchase reduction") in the event Regal elected to have Tex Star repurchase a defaulted note pursuant to its full recourse guaranty of the notes under the PSAs. The PSAs further provided that, in the event of such a repurchase, Tex Star's repurchase price would be correspondingly reduced by the amount of the repurchase reduction Regal was entitled to withdraw from the holdback reserve fund. In practice, however, Tex Star did not deduct this amount from its payments for repurchased notes, but instead periodically withdrew the aggregate amount of repurchase reductions from the holdback reserve.

In 1999, Regal secured a $25,000,000 line of credit from Bank One that it used to purchase the notes. Among other things, the Bank One loan agreement required Regal to maintain a reserve fund (the "Bank One reserve") equal to five percent of the outstanding Bank One loan principal. From 1999 to 2002, Tex Star deposited $975,000 into the Bank One reserve.

Regal stopped purchasing notes from Tex Star in July of 2002, shortly before the Bank One line of credit was to end. Soon after that, Tex Star declined to deposit further funds into the Bank One reserve. Although Tex Star continued repurchasing defaulted notes from Regal until November of that year, Regal ceased paying Tex Star the aggregate amounts of repurchase reductions from the holdback reserve; and, after the Bank One line of credit was repaid and discontinued, Regal did not return to Tex Star the funds it had deposited into the Bank One reserve while the line of credit had been in effect. In November of 2002, Tex Star stopped repurchasing defaulted notes, as required by its full recourse guaranty under the PSAs, and Regal thereafter sold the vehicles that were repossessed on those notes.

Regal filed suit against Tex Star for recovery of over $8,000,000 in deficiencies it allegedly suffered on 906 such defaulted notes after it sold the repossessed vehicles. Tex Star countersued for recovery of the $975,000 it had deposited into the Bank One reserve, $472,000 in unrefunded repurchase reductions, and statutory damages of $4,000,000 for Regal's failure, in disposing of repossessed vehicles, to provide notice and to conduct the sales in good faith and in a commercially reasonable manner. After a jury trial, the trial court entered judgment awarding Regal damages of $4,136,000, attorney's fees, and interest, and denying all relief sought by Tex Star.

Because the charge submitted to the jury at trial (the "charge") and the parties' arguments on appeal are lengthy and convoluted, we will attempt to address the

issues that are dispositive of the appeal in the order of most logical progression.

## Regal's Claims

### Overview

It is undisputed in this case that Tex Star's ceasing to repurchase defaulted notes from Regal was a breach of the PSAs and that Regal suffered a loss on the defaulted notes that Tex Star declined to repurchase. However, under the charge, Tex Star's breach could be excused if Regal's refusal to pay the aggregate amounts of repurchase reductions was a prior material breach of the PSAs that discharged Tex Star's obligations. In addition, even if Tex Star's obligation to perform was not so discharged, Regal's right to recover a deficiency from Tex Star could nevertheless be limited or barred under the charge to the extent that Regal's sales of the repossessed vehicles securing the notes were not conducted in accordance with the statutory requirements of notice, good faith, and commercial reasonableness.[1]

### Commercial Reasonableness

■ Tex Star's eighth issue contends that Regal was barred from recovering any deficiency losses on its sales of repossessed vehicles because there was no evidence that Regal sold the vehicles in a commercially reasonable manner.

### Standard of Review

In a legal sufficiency review, we determine whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). We credit favorable evidence if a

reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

■ Where there has been no objection to the charge submitted to the jury, the sufficiency of the evidence is measured by that charge even if the charge effectively raises the plaintiff's standard of proof above what is otherwise required by law. *See Romero v. KPH Consol., Inc.,* 166 S.W.3d 212, 221 (Tex.2005) (holding that the sufficiency of evidence to prove malice as an element of negligent credentialing, as contrasted from exemplary damages, would be measured by the clear and convincing evidence standard provided in the charge submitted even though the law only required it to be proved by a preponderance of the evidence); *City of Fort Worth v. Zimlich,* 29 S.W.3d 62, 71 (Tex.2000); *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex. 2000) ("it is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge.").

■ In this case, Question 6 of the charge instructed the jury that, in awarding Regal damages for its deficiency losses, it could consider only loans relating to vehicles that Regal sold in a commercially reasonable manner and that:

> Every aspect of the disposition, including the method, manner, time, place and other terms must be commercially reasonable. *A sale is commercially reasonable if it conforms to reasonable commercial practices among dealers in the type of property that was the subject of the sale.*

---

1. Although not submitted or requested to be submitted in the jury charge, Tex Star also contends that its liability was discharged as a matter of law to the extent that Regal accepted the repossessed vehicles from the purchas-ers in full satisfaction of the debt on the notes. However, our disposition of other issues makes it unnecessary to address this contention.

(emphasis added).[2]

Regal contends that the portion of the charge italicized above (the "dealer standard") is not a required or minimum standard, but merely a safe harbor that, if proved, conclusively establishes commercial reasonableness, but need not be proved in order for the commercial reasonableness requirement to be met. Regal further argues that, rather than being limited to the dealer standard, commercial reasonableness entails a balancing of several factors, and is thus, by its very nature, a case-by-case issue that defies bright line rules. Under the circumstances of this case, we disagree.

Regardless whether the standard urged by Regal is legally correct or has been applied in other cases, the charge submitted in this case states that a sale is commercially reasonable if it conforms to the dealer standard.[3] The plain meaning of this language does not suggest that the dealer standard is either a safe harbor or an otherwise optional standard,[4] or that

2. *See* Tex. Bus. & Com. Code Ann. §§ 9.610(b), 9.627(b)(3) (Vernon 2002). The PSAs also require the sale of a repossessed vehicle to be conducted in a commercially reasonable manner in conformity with the Uniform Commercial Code.

3. Because neither *Wilson, Havins*, nor any of the other authorities upon which Regal relies involved a jury charge defining commercial reasonableness, as in this case, solely by reference to the dealer standard, they do not bear on the issue before us. *See Wilson v. Gen. Motors Acceptance Corp.*, 897 S.W.2d 818 (Tex.App.-Houston [1st Dist.] 1994, no writ); *Havins v. First Nat'l Bank of Paducah*, 919 S.W.2d 177 (Tex.App.-Amarillo 1996, no writ).

4. If the definition submitted in this case created only an optional standard, rather than a required condition, then other similarly worded charge definitions, such as those below, would do so as well:

> An occurrence is caused by an act of God if it is caused directly and exclusively by the violence of nature, without human intervention or cause, and could not have been prevented by reasonable foresight or care.

Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence, Intentional Personal Torts* PJC 3.5 (2006).

> One who would otherwise be in the general employment of one employer is a "borrowed employee" of another employer if such other employer or his agents have the right to direct and control the details of the particular work inquired about.

*Id.* PJC 7.2

> An employee is acting in the scope of his employment if he is acting in the furtherance of the business of his employer.

*Id.* PJC 7.6

> Consent [to medical treatment] is implied by law if the patient is unconscious or otherwise unable to give express consent and an immediate surgical procedure is necessary to preserve his life or health.

Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Malpractice, Premises, Products* PJC 51.15 (2006).

> Apparent authority exists if a party (1) knowingly permits another to hold himself out as having authority or, (2) through lack of ordinary care, bestows on another such indications of authority that lead a reasonably prudent person to rely on the apparent existence of authority to his detriment.

Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 101.4 (2006).

> Implied ratification occurs if a party, though he may have been unaware of unauthorized conduct taken on his behalf at the time it occurred, retains the benefits of the transaction involving the unauthorized conduct after he acquired full knowledge of the unauthorized conduct.

*Id.* PJC 101.5

> One party performs compensable work if valuable services are rendered or materials furnished for another party who knowingly accepts and uses them and if the party accepting them should know that the performing party expects to be paid for the work.

*Id.* PJC 101.42.

> A relationship of trust and confidence existed if *Paul Payne* justifiably placed trust and

any other factors may even be considered, let alone balanced, but instead that a sale is commercially reasonable if (and, thus, only if) the dealer standard is met.[5] Regal's contention would thus not only render the definition submitted in the charge meaningless, it would authorize a reviewing court to measure the sufficiency of evidence against a different standard than was submitted to the jury, rendering the jury's decision meaningless and thereby defeating the parties' right to a jury trial. We thus reject Regal's contention and proceed to review the legal sufficiency of the evidence to prove commercial reasonableness based on the dealer standard, as submitted in the change.

### Sufficiency of the Evidence

Regal contends that evidence of commercial reasonableness was provided in the testimony of Jim Wright, John Thorpe, Kemp McMillan, and George McIngvale.[6] Wright was responsible for disposing of Regal's repossessed vehicles, and his testimony outlined the procedures Regal followed in doing so. Upon receiving a repossessed vehicle, Wright prepared a "condition report," which recorded the vehicle's mileage and physical condi-tion, and a "bookout sheet" containing a NADA value.[7] Regal initially then sold the vehicles to "whoever" it could, but later tried to obtain at least two bids for each vehicle from wholesalers, and thereafter sold the vehicles to the highest bidder.

Thorpe, an automobile auctioneer, testified that he had seen other dealers use a sealed bid process to dispose of repossessed vehicles,[8] and gave his opinion that a sealed bid system is an "acceptable way" to do so. McIngvale testified that there are various ways to resell cars, including working through retailers, advertised closed bid sales, open bid sales, direct auctions, and indirect auctions. McMillan, the president of Regal's managing general partner, testified that Regal did a good job of selling every repossessed vehicle the best it could for the highest price it could get.

Although these witnesses provided evidence describing how Regal sold its repossessed vehicles, identified other available methods for doing so, and sometimes gave their individual opinions on these methods, there is no evidence of which methods or

---

confidence in *Don Davis* to act in *Paul Payne's* best interest. *Id.* PJC 104.1

**5.** Regal does not dispute the meaning of the charge definition *on its face,* but instead contends that because the definition was correctly worded, it cannot be applied based on the charge language in isolation, "disregarding the UCC, its official commentary, WHITE & SUMMERS, and prior case law." On the contrary, regardless whether the definition was correct, incorrect, complete, or incomplete, because Regal did not object to the definition that was submitted, we are not at liberty to engraft or adopt a different standard after the fact from sources outside the charge.

Ironically, Tex Star submitted a proposed charge question which did not define "commercially reasonable," but instead listed sixteen factors that could be considered, one of which was the dealer standard. This question would have considerably lowered Regal's standard of proof on commercial reasonableness relative to the definition submitted, but the trial court refused to submit it, presumably because Regal would not agree to it.

**6.** McIngvale and his wife, Deborah, are co-owners of Tex Star.

**7.** The National Automobile Dealers Association, or NADA, provides, among other things, used vehicle pricing and information for buyers and sellers. *See* http://www.nada.com.

**8.** The parties dispute whether the procedure employed by Regal was, in fact, a sealed bid process.

procedures would be considered reasonable commercial practices among dealers under similar circumstances, which would not, or why.[9] The jury thus had no frame of reference for assessing whether Regal's practices fit within what would, or would not, actually be considered reasonable commercial practices among dealers.[10] Under these circumstances, we can find no evidence to show that the methods and procedures Regal used to sell the vehicles it repossessed conformed to reasonable commercial practices among dealers, as required by the charge.

Therefore, Tex Star's eighth issue is sustained to that extent,[11] and we need not address Tex Star's other challenges to the recovery awarded to Regal.

9. The trial court denied Regal's request to allow Wright to testify on standard practices in the used vehicle market and Regal's compliance with those practices because he had not been timely designated as an expert witness. Regal has not assigned error to that ruling on appeal.

It is arguable that obtaining a commercially reasonable price for a vehicle, such as that published by the NADA, supports an inference that a commercially reasonable practice was employed to obtain that price. In this case, however, the charge instructed the jury that every aspect of the disposition was required to be commercially reasonable, i.e., without regard to the outcome, and there is no evidence to support an inference that a NADA price could only be obtained if commercially reasonable practices were followed and not by mere happenstance.

Because we conclude that there was no evidence of commercial reasonableness of any kind in this case, we do not address whether expert testimony is required to prove commercial reasonableness. We cannot, for example, rule out the possibility that, in a given set of facts and jury charge language, sufficient proof could be provided by a fact witness with extensive experience, by reference to promulgated industry or trade association guidelines, or otherwise to enable a jury to decide this issue.

10. In addition, to whatever extent a particular method used by Regal, such as the use of sealed bids, could be a reasonable commercial practice among dealers under any circumstances, there is no evidence of what those circumstances would be, or of how that method would have to be carried out, in order for it to be considered commercially reasonable among dealers. There is, however, evidence that: (1) Regal did not advertise any of its sales; (2) Wright's only method of soliciting bids was to call wholesalers he knew; (3) Regal accepted bids that were well below NADA values; (4) those who purchased from Regal usually resold the vehicles quickly at higher prices, with little or no repair work, including many that were taken directly to auction by the purchasers; (5) Regal deviated from its own procedures in having no NADA value sheet in the file for more than 300 repossessions, selling 200 vehicles with only one bid, and having no condition report in numerous files; (6) Regal's claim that it was unable to obtain as high a yield on ten vehicles it sold at auction as with private sales to wholesalers is unsupported by the evidence in that files for eight of the ten sales made at auction do not contain any other bids for comparison purposes, and the remaining two files establish that the auction price was actually higher than the wholesalers' bids; (7) of the 287 vehicles for which Tex Star had resale information, 138 were sent to wholesale public auctions after Regal sold them to a wholesaler, and yielded an average profit of $874 above what Regal received; and (8) although Wright testified that any licensed wholesaler with adequate credit was allowed to bid on Regal's repossessed vehicles, Thorpe testified that Wright did not permit him to do so on several occasions.

11. In "consumer transactions," a secured party that fails to prove compliance with the statutory requirements for disposition of collateral is barred from collecting any deficiency. See TEX. BUS. & COM.CODE ANN. § 9.626(a), State Bar Committee cmt. (Vernon 2002). Because Question 6 of the charge instructed the jury, in deciding damages, to consider only notes relating to vehicles that Regal sold in a commercially reasonable manner, such that a recovery of deficiencies on any other vehicles would be barred, it thereby treated the transactions as consumer transactions for this purpose, and neither party objected or has assigned error to that aspect of the charge.

### First Material Breach

■ Although Tex Star contends that Regal's refusal to continue periodically refunding the aggregate repurchase reductions was a material breach of the PSAs (discharging Tex Star's performance thereunder), the PSAs do not address this possibility (presumably because they do not anticipate that Tex Star would refrain from deducting the repurchase reductions from the amounts it paid to repurchase the notes). Instead, the only provision obligating Regal to pay Tex Star amounts from the holdback reserve fund states:

> Until this Agreement is terminated, and if [Tex Star] is not in default under this Agreement or any other obligation to [Regal] on such date, [Regal] will pay to [Tex Star] upon [Tex Star's] written request within fifteen (15) days following each calendar quarter or at [Regal's] option more frequently, the amount by which the Holdback Reserve Account balance exceeds fifteen percent (15%) of the aggregate unpaid net balance of all [notes] held by [Regal] on such date.

Tex Star asserts that Regal breached the PSAs by failing to periodically refund the entire amount of aggregate repurchase reductions, without reference to whether the holdback reserve account balance was greater than fifteen percent of the aggregate unpaid net balance of all notes held by Regal on any dates that Tex Star claims the refunds were due. Because the PSAs impose no such obligation on Regal, Tex Star has not established that Regal's failure to make the refunds on the basis claimed by Tex Star constituted any breach of the PSAs, let alone a material breach that could discharge Tex Star's obligation to perform.

Tex Star has also challenged questions 1 through 5 of the charge on the ground that

they improperly allowed the jury to consider Tex Star's alleged oral agreement to fund the Bank One reserve, and its alleged breach of that separate agreement, in determining whether Tex Star or Regal committed the first material breach of the PSAs, thereby discharging the other from further performance under the PSAs. However, because we have concluded above that the action Tex Star relies upon to constitute Regal's breach of the PSAs did not do so, questions 1–5 and the jury's answers to them are immaterial.

In addition, it is undisputed that Regal's refusal to refund repurchase reductions to Tex Star occurred before Tex Star refused to make further contributions to the Bank One reserve or to repurchase defaulted notes. Therefore, the jury's finding that Tex Star committed the first material breach of the PSAs would suggest that the jury had concluded that Regal's previous refusal to refund the repurchase reductions was not a breach or material breach of the PSAs, further rendering questions 1 through 5 and the answers thereto immaterial. Therefore, we overrule Tex Star's fourth, fifth, and thirteenth issues to that extent.

### Tex Star's Claims

#### Deposits to Bank One Reserve

■ Tex Star's first issue challenges the trial court's failure to award the $975,000 it had deposited into the Bank One reserve. In response to charge question 8 on Tex Star's claim for money had and received, the jury found that Regal held $975,000 that belonged to Tex Star in connection with the Bank One reserve. The trial court's judgment did not award this amount to Tex Star or offset the amounts awarded to Regal by this amount.[12]

Regal's motion to disregard question 8 contended that there can be no claim for

---

12. We cannot discern from the record whether the jury could have deducted this amount

money had and received if the same subject matter is covered by an express contract. *See, e.g., Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex.2000). Because the jury found that Regal and Tex Star had orally agreed that Tex Star would maintain the dealer reserve account at the level required by the Bank One loan agreement, Regal argued that question 8 was immaterial. On appeal, Regal also asserts that the agreement by Tex Star to fund the Bank One reserve constituted an amendment to the PSAs as a matter of law, and that the PSAs allowed Regal to hold all reserve account funds, from both the holdback and Bank One reserves, until all of the notes had been liquidated, which had not occurred by the time of trial.

To whatever extent there is evidence of an oral agreement by Tex Star to fund the Bank One reserve, there is no evidence or finding of any agreement that Regal would be entitled to keep the funds that Tex Star had deposited into the Bank One reserve after the line of credit was discontinued. Nor was there any evidence or finding that any agreement had been reached concerning the time or manner of returning those funds to Tex Star, such that Tex Star could have sued for its breach. Therefore, the record does not reflect that any oral agreement to fund the Bank One reserve foreclosed a quasi-contract claim for the return of those funds. *See id.* at 685 (affirming award of unjust enrichment damages to Cox because the evidence did not reflect the specific terms of the unwritten agreement Conoco had with Cox from

and after 1990 and because Conoco did not request a jury finding or move for a directed verdict to establish those terms).

Although Regal contends on appeal that the oral agreement was an amendment to the PSAs (rather than a separate agreement) as a matter of law, we have found no indication in the record that Regal made this contention at trial, and it is unsupported by any evidence that the parties intended the oral agreement to amend the PSAs [13] or by any legal authority suggesting that a written agreement can be deemed amended by another agreement without such intent, *i.e.*, merely because each agreement relates in part to common subject matter.[14] Therefore, based on the jury verdict, Tex Star was entitled to either an award of the amount it had deposited to the Bank One reserve, or an offset of the damages awarded against it by that amount. Accordingly, Tex Star's first issue is sustained to that extent.

### Statutory Damages

■ Tex Star's second issue contends that the trial court erred by failing to award it statutory damages for Regal's failure to dispose of the vehicles in accordance with the Texas Business and Commerce Code. However, the charge instructed the jury that if it did "not find that the preponderance of the evidence supports a "Yes" answer, then answer "No." " The jury questions on which Tex Star relies in support of this issue then essentially asked the jury whether Regal complied with its obligations to proceed in good faith and in

---

from any of the damages it awarded.

13. There is also no evidence that: (1) the alleged oral agreement purported to modify or replace any of the existing reserve provisions or other obligations under the PSAs; or (2) the Bank One reserve funds were intended to ever be paid to Regal for any reason or to serve any purpose other than solely to secure the Bank One loan.

14. Regal also contends on appeal that Tex Star waived its right to judgment on the disregarded jury finding by failing to challenge all grounds asserted in the motion to disregard. However, Regal does not specify, and we have not found, any such unchallenged grounds.

a commercially reasonable manner. The jury's "No" answers to these questions was thus not an affirmative finding that Regal had *not* complied with these obligations, as would be required to support a recovery by Tex Star, but merely a failure to find that it *had* complied.[15] Because Tex Star's second issue thus fails to demonstrate that the trial court erred in awarding it no damages based on these portions of the verdict, it is overruled.

### Cross Appeal

 Regal filed a notice of cross-appeal, and its sole cross-appeal issue states that,

*in the event of a new trial,* it conditionally requests reinstatement of its fiduciary duty claims because the trial court erred in refusing to submit Regal's proposed jury questions on whether Tex Star, George McIngvale, and Debora McIngvale breached fiduciary duties they owed to Regal.[16] Because this issue was conditioned on granting of a new trial, and no new trial is being granted, it has no application to our disposition and is overruled.[17]

Accordingly, we: (1) reverse the portions of the judgment awarding Regal damages, attorney's fees, and interest, and

---

15. *See, e.g., Carl J. Battaglia, M.D., P.A. v. Alexander,* 177 S.W.3d 893, 903 (Tex.2005); *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex.1989); *Morris v. Holt,* 714 S.W.2d 311, 313 (Tex.1986); *Grenwelge v. Shamrock Reconstructors, Inc.,* 705 S.W.2d 693, 694 (Tex.1986); *C & R Transp., Inc. v. Campbell,* 406 S.W.2d 191, 194 (Tex.1966).

16. *See* Tex.R. Civ. P. 277, 278 (requiring a trial court to submit to the jury the questions, instructions, and definitions that are raised by the pleadings and evidence and are proper to enable the jury to render a verdict).

17. In addition, the portions of Regal's briefs addressing this issue do not indicate: (1) what specific fiduciary duty(s) any of these defendants had which they breached; (2) what specific conduct by any of these defendants constituted a breach of any fiduciary duty or when that conduct occurred relative to when the duty arose; (3) how any breach of fiduciary duty by any defendant caused damage to Regal; or (4) where in the record evidence of these things can be found. *See* Tex.R.App. P. 38.1(h) (requiring appellant's brief to contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record). In this regard, even Regal's reply brief in support of its conditional cross-appeal focuses almost exclusively on the existence of the relationship and merely states with regard to the breach, "McIngvale does not even contest the sufficiency of the evidence on the element of breach—he simply argues that no fiduciary duty existed. Therefore we will not belabor that point."

Moreover, Regal's briefs contend that the existence of the fiduciary relationships was based on: (1) George McIngvale and Tex Star being general partners of Regal: and (2) Debora McIngvale being controller, and thus an agent, of Regal. However, the formal relationships that exist between partners and between principals and agents give rise to a fiduciary duty as a matter of law. *See, e.g., Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 593–94 (Tex. 1992). To the extent another moral, social, domestic, or personal relationship of trust and confidence may give rise to an informal fiduciary duty, the existence of such a relationship is usually a question of fact. *See Meyer v. Cathey,* 167 S.W.3d 327, 330–31 (Tex.2005); *Crim Truck,* 823 S.W.2d at 594. The jury question that Regal requested on the existence of a fiduciary duty did not pertain to the existence of a formal fiduciary relationship, such as a partnership or principal-agent relationship (and none would have been appropriate on such a question of law unless the facts giving rise to the existence of such a duty were disputed), but was instead directed to the existence of an informal fiduciary relationship, as would arise in another context as a question of fact. *See* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 104.1, 104.2 comment (2006).

In addition, Regal did not request the trial court to rule on whether the evidence established a formal fiduciary relationship as a matter of law (such as by a motion for directed verdict, motion for entry of judgment, or

render judgment that Regal take nothing on its claims; (2) reverse the portion of the judgment denying Tex Star recovery of its claim for money had and received, render judgment that Tex Star is entitled to recovery on that claim in accordance with the jury's verdict, and remand the case to the trial court for entry of judgment on that claim, including consideration of attorney's fees, costs, and interest, if any; and (3) affirm the portion of the judgment denying Tex Star recovery for breach of contract, statutory damages, and penalties.

the like). During trial, Tex Star and the McIngvales moved for an instructed verdict on Regal's fiduciary duty claims and provided the trial court a memorandum contending that the parties' relationships did not give rise to a fiduciary duty as a matter of law. Regal has cited, and we have found, no portion of the record where the trial court ruled on this motion other than by refusing the submission of Regal's jury questions. In and of itself, that ruling addresses only whether there were fact issues to be decided by the jury concerning the matters set forth in those questions, not whether any fiduciary duties existed as a matter of law, as Regal contends on appeal; and Regal has not identified or assigned error to any other ruling by the trial court that could have addressed that issue.

Therefore, Apart From Being Conditioned On An Event That Has Not Occurred, Regal's Cross-Point: (1) Fails To Cite Evidence Establishing The Existence Of An Informal Fiduciary Relationship Or The Breach Of Any Fiduciary Duty (Formal Or Informal) And Damages Therefrom, And Thus Fails To Demonstrate That The Trial Court Erred By Refusing To Submit The Jury Questions On Fiduciary Duty; And (2) Assigns No Error To Any Other Ruling By The Trial Court With Regard To Its Claim For Breach Of A Formal Fiduciary Duty, And Thus Affords No Basis For Relief On That Claim.