**Reversed and Remanded in Part and Affirmed in Part and Opinion on Remand filed January 10, 2012.**



In The

# Fourteenth Court of Appeals

## NO. 14-05-00215-CV

### TEX STAR MOTORS, INC., Appellant

### V.

### REGAL FINANCE COMPANY, LTD. AND REGAL FINANCE COMPANY II, LTD., Appellees

**On Appeal from the 61st District Court
Harris County, Texas
Trial Court Cause No. 2002-41615**

## O P I N I O N   O N   R E M A N D

Used car dealer Tex Star Motors, Inc. contracted to sell car notes to Regal Finance Company, Ltd. and Regal Finance Company II, Ltd. (collectively, "Regal"). Regal sued Tex Star alleging breach of contract and seeking more than $8 million in damages. Tex Star filed a counterclaim seeking $975,000 deposited in a reserve fund. After a jury trial, the trial court signed a final judgment awarding Regal approximately $4 million in damages, along with attorneys' fees and interest. The final judgment denied all relief sought by Tex Star.

On original submission, this court reversed portions of the judgment and rendered judgment that Regal take nothing on its claims. The court further remanded for entry of judgment in favor of Tex Star with respect to the $975,000 contained in the reserve. Finally, this court affirmed a portion of the judgment denying Tex Star recovery for breach of contract, statutory damages, and penalties. *Tex Star Motors, Inc. v. Regal Fin. Co.*, 246 S.W.3d 745, 755–56 (Tex. App.—Houston [14th Dist.] 2008), *rev'd, Regal Fin. Co.*, *v. Tex Star Motors, Inc.* No. 08-0148, 2010 WL 3277132 (Tex. Aug. 20, 2010) (not yet released for publication). In setting aside Regal's favorable judgment, this court concluded there was no evidence of commercial reasonableness in connection with the manner in which Regal disposed of repossessed vehicles. *Id.* at 752.

The supreme court concluded that the record contains legally sufficient evidence of commercial reasonableness and reversed this court's judgment. *Regal*, 2010 WL 3277132, at *7. The supreme court also remanded "the other issues in the case" for "further consideration" by this court. *Id.*

After further consideration of the other issues in the case, we affirm the trial court's judgment in part and reverse and remand in part.

## I. Factual and Procedural Background

Tex Star signed Retail Installment Contract Purchase and Sales Agreements ("PSAs") with Regal in 1996 and 1999. The PSAs obligated Tex Star to offer secured automobile installment notes generated in the course of its used car business to Regal, which could purchase or reject the notes at its discretion.

Tex Star sold the notes to Regal with "full recourse," meaning Regal could require Tex Star to repurchase nonperforming loans. Tex Star handled collections, repossessions, and sales of repossessed vehicles on Regal's behalf.

To secure Tex Star's "full recourse" repurchase obligation to Regal, the PSAs provided for a reserve to be funded from Regal's note purchases.[1] When Regal bought a

---

[1] This reserve is called the "Holdback Reserve" in the PSAs. A subsequent agreement refers to the "Dealer Reserve Account."

car note from Tex Star, Regal paid Tex Star the amount financed by the buyer less $750. This $750 was deposited into the reserve. When a car note fell into default, the PSAs required Tex Star to repurchase the note for the net unpaid balance less $2,000. The PSAs allowed Regal to recover the remaining $2,000 from the reserve. After payment of all notes purchased from Tex Star, Regal was to return any amount remaining in the reserve to Tex Star.

In practice, Tex Star and Regal performed under the PSAs in a slightly different fashion. Instead of repurchasing notes by paying Regal the net unpaid balance less $2,000, Tex Star paid Regal the entire net unpaid balance. Regal, in turn, drew from the reserve to pay Tex Star $2,000 for each repurchased note.

As its business with Tex Star expanded, Regal outgrew its existing relationships with smaller banks that had been funding Regal's note purchases from Tex Star. Regal then obtained a three-year, $25 million revolving line of credit from Bank One. The 1999 Bank One loan agreement required a bigger reserve than Tex Star and Regal had been using; the larger reserve had to equal five percent of the principal balance of Regal's outstanding notes.

Regal and Tex Star never entered into a written agreement specifying who would bear responsibility for increasing the reserve to comply with the 1999 Bank One loan agreement. Regal's manager testified that Tex Star orally agreed to maintain the reserve at the new, higher level so Tex Star could obtain additional financing from Regal without additional personal liability for Tex Star's owners. Tex Star denied the existence of any oral agreement.

In practice, Regal continued to fund the reserve in part by retaining $750 for each note purchased from Tex Star; when the reserve dipped below five percent of the principal balance of Regal's outstanding notes, Tex Star deposited additional money into the reserve. Tex Star deposited $975,000 between 1999 and 2002. The jury found that the parties agreed that Tex Star would maintain the reserve at the five percent level required by the 1999 Bank One loan agreement.

3

Bank One eventually decided to exit sub-prime auto lending and notified Regal in 2002 that it would not renew Regal's line of credit. Regal stopped purchasing notes from Tex Star in July 2002. At about the same time, Regal sought $386,000 from Tex Star to bring the reserve into compliance with the Bank One loan agreement's five percent requirement. Tex Star refused to pay the requested $386,000. Tex Star continued to repurchase nonperforming notes from Regal over the next few months, but Regal stopped paying Tex Star $2,000 per note from the reserve.

Tex Star notified Regal in November 2002 that it was suspending performance under the PSAs and no longer would collect notes, repossess vehicles, or sell repossessed vehicles on Regal's behalf. Thereafter, Regal itself sold vehicles that were repossessed on notes purchased from Tex Star.

In early December 2002, Regal established a location to service its note portfolio and handle repossessions. Within three days of opening this location, Regal accepted 100 repossessed vehicles from Tex Star followed by 2,400 loan files over the next two weeks. Regal hired Jim Wright, an automobile sales professional who had bought and sold several thousand used vehicles over a 29-year period, to evaluate and sell repossessed vehicles for Regal.

After selling 906 repossessed vehicles for less than the outstanding loan balances, Regal sued Tex Star for the deficiency and sought damages totaling $8,113,055. Tex Star filed a counterclaim seeking funds held in the reserve; monies allegedly owed to Tex Star under the PSAs for repurchased notes; and statutory damages for Regal's alleged failures to (1) provide notice; and (2) conduct sales of repossessed vehicles in good faith and in a commercially reasonable manner.

The case was tried to a jury, which found that Tex Star failed to comply with the PSAs and was liable for some — but not all — of the deficiencies. In answering the damages question, the jury was instructed to consider only loans relating to vehicles that Regal sold in good faith and in a commercially reasonable manner. Having determined that Regal sold some vehicles in good faith and in a commercially reasonable manner, the

jury awarded Regal $4 million in deficiency damages. The jury also found that Tex Star agreed to maintain the reserve at the level required by the Bank One loan agreement, and that $975,000 would compensate Tex Star for money had and received by Regal from Tex Star with respect to the reserve. The trial court rendered judgment on the verdict, in part, by awarding Regal $4,136,000 in damages plus attorneys' fees and interest. The court ordered that Tex Star take nothing on it counterclaims. The judgment contains no explicit or specific disposition of the $975,000.

On original submission to this court, Tex Star appealed on grounds that (1) the trial court erred in failing to award Tex Star recovery in accordance with the portions of the jury's verdict decided in its favor; (2) the jury charge was erroneous in certain respects; (3) the evidence is legally and factually insufficient to support certain of the jury's findings in favor of Regal; (4) the trial court erred in making a joint award of attorneys' fees to Regal and in awarding attorneys' fees without evidence of segregation among claims, defenses, and parties; and (5) the trial court improperly awarded prejudgment interest for a period before Regal's loss accrued. *Tex Star*, 246 S.W.3d at 747–48.

This court concluded that (1) Tex Star was entitled to "an award of the amount it had deposited to the Bank One reserve, or an offset of the damages awarded against it by that amount" with respect to the commercial reasonableness of certain vehicle dispositions; (2) the evidence was legally insufficient to support the jury's findings in favor of Regal with respect to the commercial reasonableness of its vehicle dispositions; (3) Tex Star committed the first material breach of the PSAs; and (4) Tex Star failed to demonstrate that the trial court erred in awarding no statutory damages for Regal's failure to dispose of vehicles in accordance with the Texas Business and Commerce Code. *Id.*

On petition for review, the supreme court concluded that legally sufficient evidence supports a finding that at least a portion of Regal's vehicle sales were commercially reasonable. *Regal*, 2010 WL 3277132, at *7. The supreme court remanded to this court for consideration of (1) Tex Star's factual sufficiency challenge to the findings that Regal observed reasonable commercial standards of fair dealing with

5

respect to vehicle dispositions; and (2) "the other issues in the case." *Id.*

## II. Issues on Remand

Based on the supreme court's instruction to consider "the other issues in the case" and the parties' issues as briefed on remand, this opinion will discuss (1) the factual sufficiency of the evidence to support the jury's finding in Question 6 that sales of repossessed vehicles were conducted in a commercially reasonable manner; (2) Tex Star's challenges to Regal's Article 9 claims based on acceptance of collateral, failure to establish compliance with the UCC, and other jury findings; (3) Tex Star's claim for "money had and received;" (4) the trial court's award of attorneys' fees to Regal; and (5) the prejudgment interest calculation.[2]

### A. Factual Sufficiency of the Evidence

In answer to Questions 5A and 5B, the jury found that Tex Star failed to comply with the PSAs. Tex Star's factual sufficiency challenge focuses on the jury's answer to Question 6. This question asked, "What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Regal I and Regal II for their damages, if any, that resulted from [Tex Star's material breach of the PSAs]?" In assessing damages, the jury was instructed to consider only loans relating to vehicles that Regal sold in good faith and in a commercially reasonable manner. According to Tex Star, the evidence does not support a finding in connection with Question 6 that Regal acted in good faith and in a commercially reasonable manner when selling repossessed cars.

We must consider and weigh all of the evidence in reviewing factual sufficiency. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Id.*

---

[2] On remand, Tex Star re-urged but did not re-argue issues five, eleven, twelve, and thirteen raised in its original briefing. We address issues eleven and twelve below. As to issues five and thirteen, we have re-examined the dispositions of these issues in the prior panel opinion and reaffirm those dispositions here.

Article 9 of the Uniform Commercial Code requires a secured creditor to act in good faith and in a commercially reasonable manner; in most circumstances, reasonable notification when disposing of repossessed collateral must be provided. *See* Tex. Bus. & Com. Code Ann. § 9.625 cmt. 2 (Vernon 2011). A secured creditor must prove it disposed of the collateral in a commercially reasonable manner before it may recover any deficiency. *See id.* § 9.610. Every aspect of a collateral disposition must be commercially reasonable, "including the method, manner, time, place, and other terms." *Id*. § 9.610(b).

Commercial reasonableness is a fact-based inquiry that balances two competing policies: (1) protecting debtors against creditor dishonesty; and (2) minimizing interference in honest dispositions. *Regal*, 2010 WL 3277132, at *5. The trial court instructed the jury on the meaning of good faith and commercial reasonableness in Question 6:

> In answering this question, consider only Loans relating to vehicles that [Regal] sold in good faith and in a commercially reasonable manner. Good faith means honesty in fact and the observance of reasonable commercial standards of fair dealing.
>
> Every aspect of the disposition, including method, manner, time, place and other terms must be commercially reasonable. A sale is commercially reasonable if it conforms to reasonable commercial practices among dealers in the type of property that was the subject of the sale.
>
> The fact that a greater amount could have been obtained by a collection, enforcement, disposition, or acceptance at a different time or in a different method from that selected by [Regal] is not of itself sufficient to preclude [Regal] from establishing that the collection, enforcement, disposition, or acceptance was made in a commercially reasonable manner.

Courts have considered a number of non-exclusive factors when addressing commercial reasonableness, including whether (1) the secured party endeavored to obtain the best price possible; (2) the collateral was sold in bulk or piecemeal; (3) the collateral was sold via private or public sale; (4) the collateral was available for inspection before the sale; (5) the collateral was sold at a propitious time; (6) the expenses incurred during the sale were reasonable and necessary; (7) the sale was advertised; and (8) multiple bids were

7

received.  *See, e.g.*, *Havins v. First Nat'l Bank of Paducah*, 919 S.W.2d 177, 181 (Tex. App.—Amarillo 1996, no writ).  Courts also have considered the collateral's condition and where the sale was conducted.  *Id.*

The jury heard evidence addressing commercial reasonableness at trial via testimony from Jim Wright, Kemp McMillan, John Thorpe, and George McIngvale. Wright evaluated and sold Regal's repossessed vehicles.  McMillan owned the Regal partnerships.  Thorpe is a vehicle wholesaler.  McIngvale owned Tex Star with his wife, Deborah.

Wright worked as a sales manager for a Ford dealership in Houston for 16 years. He began wholesaling vehicles in 1996.  He described his wholesaling business as a process in which he purchased vehicles that dealerships were unable to sell on a retail basis.  He began buying cars for Tex Star in 1999 due to his relationship with the McIngvale family.  In December 2002, Regal hired Wright to dispose of the repossessed vehicles Regal received after terminating its relationship with Tex Star.  Wright had approximately 29 years' experience selling vehicles at the wholesale and retail levels.

Wright prepared a condition report upon receiving a repossessed vehicle.  This report recorded the vehicle's mileage and physical condition.  Wright also prepared a "bookout sheet" containing the "NADA value."[3]

Wright testified that most of the vehicles originally were sold with high mileage. When they were repossessed, many of the vehicles had "severe body damage[], bad engines, transmissions."  Many of the vehicles would not pass state inspection at the time of repossession.  Regal initially sold the vehicles to whomever it could, but later tried to obtain at least two bids for each vehicle from wholesalers; thereafter, Regal sold the vehicles to the highest bidder.

Wright knew several wholesalers and contacted them about the repossessed vehicles.  He did not, however, limit sales to people he knew; he sold the vehicles to anyone with a valid Texas dealer's license.  Wright testified that he tried to sell some of

---

[3] The National Automobile Dealers Association, or NADA, provides used vehicle pricing information for buyers and sellers.

the vehicles at auction but was unable to obtain the best price. He cited higher bids outside the auction process, plus fees charged by the auction house, as reasons not to sell the vehicles at auction. He tried to get as much money as possible for the repossessed vehicles, but testified it was "impossible" to obtain full NADA value due to the poor condition of most vehicles.

In addition to Wright's testimony, 906 loan files were admitted into evidence. These files generally established the time, place, and other terms of the dispositions. A complete file contained the loan note, a certificate of title, a loan payment record, a repossession affidavit, a vehicle condition report, a NADA form estimating value, and any bids tendered for the vehicles. Not all of the loan files admitted into evidence were complete. Copies of various negotiable instruments containing the date, time, and price, and identifying the buyer, also were admitted into evidence.

McMillan testified that Regal did not have a license to sell used cars on the retail market. He further testified that attempting to sell the vehicles at retail would have required Regal to hire salespeople, repair the vehicles, engage in advertising, and provide financing. McMillan testified that Regal did a good job of selling every repossessed vehicle for the highest price it could get.

Tex Star disputed Regal's account of its unsuccessful auctions by comparing information in the loan files to the auction results. On cross examination, Wright admitted not receiving at least two bids on every vehicle and acknowledged that the 906 loan files were not always complete. Additionally, testimony showed vehicles were not publicly advertised for sale; other evidence revealed a large average deficiency per sale.

Tex Star also presented the testimony of wholesaler John Thorpe, a licensed automobile auctioneer with approximately 25 years' experience. In 2000, 2001, and 2002, he worked for Pasadena Auto Auctions acquiring repossessed vehicles and trade-ins from Tex Star. In early December 2002, Thorpe learned that Regal was selling repossessed Tex Star vehicles. The owner of Pasadena Auto Auctions instructed Thorpe to purchase as many of the repossessed vehicles from Regal as possible. Upon learning that Regal was selling the vehicles through a sealed bid process, the owner of Pasadena

9

Auto Auctions instructed Thorpe to "bid them real high . . . buy the business."

Thorpe testified that he bid unsuccessfully on some of Regal's vehicles. Some of those vehicles were sold to another wholesaler, Carl Howard. Thorpe subsequently bought several Regal vehicles from Howard. He paid Howard more for the vehicles than Howard paid Regal. On "a few" of the vehicles, he bid more to purchase them from Regal than he paid Howard. He further testified that his bids to Regal were higher than what Howard had paid for the vehicles. After purchasing vehicles from Howard, Pasadena Auto Auction sold them at auction. Pasadena Auto Auction detailed and repaired the vehicles and charged an average sales fee of $300 per vehicle.

On cross examination, Thorpe testified that Regal had been "flooded" with vehicles within about one week's time. He received "some sort" of notice to alert him to the fact that the vehicles were for sale. When he was on Regal's lot, three other wholesale dealers also were on the lot. Thorpe testified that most of the vehicles needed repair, as is generally true for repossessed vehicles. He further testified that a sealed bid process is an "acceptable way" to dispose of vehicles in this condition. The last time Thorpe went out to the Regal lot in February and attempted to submit bids, Wright told him he had "all the bidders [he] need[ed]." Thorpe did not keep copies of the bids he submitted to Wright.

McIngvale testified that there are various ways to resell cars, including working through retailers, advertised closed bid sales, open bid sales, direct auctions, and indirect auctions.

In asserting that the evidence is factually insufficient to establish commercial reasonableness, Tex Star argues that Regal offered no evidence on any of the factors listed in *Havins*, 919 S.W.2d at 181. Tex Star further argues that Regal "failed to address any particular disposition of any particular vehicle, merely lumping all of the dispositions together as if the vehicles were fungible." We reject these contentions.

Regal presented evidence in the form of testimony and loan files that it endeavored to obtain the best price possible while keeping expenses down. The record

10

reflects that most vehicles were sold individually, but some were sold to wholesalers in batches. With regard to timing, Regal attempted to sell the vehicles as soon as it was able to organize sales. The evidence conflicts as to the vehicles' conditions and whether multiple bids were received. The sales were conducted on Regal's lot.

The supreme court addressed legal sufficiency by determining that Regal's testimony regarding the method and manner of its sales — coupled with loan files evidencing time, place, and other terms — created more than a suspicion or surmise that at least some of Regal's sales were commercially reasonable. *Regal*, 2010 WL 3277132, at *7. Having reviewed all of the evidence of commercial reasonableness, we likewise reject Tex Star's factual sufficiency challenge to the jury's answer to Question 6. While Tex Star challenged much of Regal's evidence, we conclude the evidence is not so weak as to render the jury's finding of commercial reasonableness in connection with Question 6 unfair or unjust. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001).

## B. Tex Star's Challenges to Regal's Article 9 Claims

In original issues six, seven, eight, and nine, Tex Star contends Regal is not entitled to recover its deficiency damages because (1) findings in Questions 16-21 that Regal failed to comply with the UCC in connection with specific vehicles control over the findings in Questions 5A, 5B, 6(a), and 6(b); (2) Regal failed to provide notice of its intent to resell some of the repossessed vehicles; and (3) Regal accepted some of the vehicles in satisfaction of the debts.

### 1. Which jury findings control?

Questions 6(a) and 6(b) asked the jury to determine damages for the difference between the unpaid balance on all loans Tex Star had not guaranteed and the amount Regal received upon sale of the vehicles that served as collateral for such loans, considering only loans relating to vehicles that Regal sold in good faith and a commercially reasonable manner.

Over Regal's objection, the trial court also submitted Questions 16-21 to the jury containing a "yes" or "no" checklist for hundreds of individual vehicles. With respect to

11

each listed vehicle, Questions 16-21 asked whether Regal complied with its obligations to proceed in good faith and in a commercially reasonable manner, and whether Regal provided written notice to Tex Star of its intent to dispose of each listed vehicle. The jury answered "no" for some of the individually listed vehicles.

In rendering judgment, the trial court disregarded the findings in Questions 16-21 and rendered judgment on the jury's answers to Questions 6(a) and 6(b).

Tex Star argues that Regal is barred from recovering its deficiency claims because the jury's more specific findings in answer to Questions 16-21 control over the more general findings in Question 6 on which the court entered judgment. Tex Star cites *Barclay v. C.C. Pitts Sand & Gravel Co.*, 387 S.W.2d 644, 647 (Tex. 1965), and *Texas Imports v. Allday*, 649 S.W.2d 730, 737 (Tex. App.—Tyler 1983, writ ref'd n.r.e.). We reject Regal's contention because *Barclay* was overruled in *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 925 (Tex. 1981), in which the supreme court embraced broad form submission and expressly overruled the requirement of specific findings for each discrete issue.

### 2. Notice

Tex Star argues that Regal's sales of repossessed vehicles were invalid because Regal failed to provide Tex Star, as secondary obligor, with a mandatory authenticated notice before any disposition of the collateral. *See* Tex. Bus. & Com. Code Ann. §§ 9.102(7), 9.611(b)(c)(2).

Section 9.611(b)(c)(2) requires a secured party who disposes of collateral to send "reasonable authenticated notification of disposition to any secondary obligor." The only limit on the creditor's disposition of collateral is that it must be commercially reasonable, and it must be made only after notification to the debtor if required by section 9.504 of the Texas Business and Commerce Code. *Tannenbaum v. Econ. Lab., Inc.*, 628 S.W.2d 769, 771 (Tex. 1982) (construing section 9.504, predecessor to sections 9.610 and 9.611). Reasonable notification means notification reasonably calculated to give actual notice of the relevant fact to the person responsible for acting upon that fact. *See Adcock v. First*

*City Bank of Alice*, 802 S.W.2d 305, 307 n.3 (Tex. App.—San Antonio 1990, no writ); *MBank Dallas, N.A. v. Sunbelt Mfg., Inc.*, 710 S.W.2d 633, 635–36 (Tex. App.—Dallas 1986, writ ref'd n.r.e.).

However, section 9.601(g) provides:

> Except as otherwise provided in Section 9.607(c), this subchapter imposes no duties upon a secured party that is a consignor or is a buyer of accounts, chattel paper, payment intangibles, or promissory notes.

Tex. Bus. & Com. Code Ann. § 9.601(g). Subsection (g) exempts buyers of chattel paper because those buyers "own the entire interest in the property sold and so may enforce their rights without regard to the seller (debtor) or the seller's creditors." *Id.* cmt. 9.

As a purchaser of chattel paper, Regal owed Tex Star no duties "except as otherwise provided in Section 9.607(c)." *Id*. § 9.601(g). Section 9.607(c) states that:

> (c) A secured party shall proceed in a commercially reasonable manner if the secured party:
>
> (1) undertakes to collect from or enforce an obligation of an account debtor or other person obligated on collateral; and
>
> (2) is entitled to charge back uncollected collateral or otherwise to full or limited recourse against the debtor or a secondary obligor.

*Id*. § 9.607(c). Therefore, Regal owed Tex Star the duty to proceed in a commercially reasonable manner. Section 9.611 does not require notice in this instance because Regal was a purchaser of chattel paper under section 9.601.

### 3. Acceptance of collateral in satisfaction of debt

Tex Star contends that Regal was not entitled to pursue a deficiency on 386 of the 906 notes because Regal exercised its right to accept the collateral in full satisfaction of the debt. Tex Star argues that its obligation under the PSAs was expressly limited to the obligation of the debtor on the contract. Therefore, according to Tex Star, Regal necessarily released Tex Star as the secondary obligor when Regal released the debtor.

Under section 9.622 of the Texas Business and Commerce Code, a secured party's acceptance of collateral in full or partial satisfaction of the obligation discharges the

13

obligation to the extent consented to by the debtor. *Id*. § 9.622. The comment to section 9.622 specifically provides, "Unless otherwise agreed, the obligor remains liable for any deficiency." *Id*. cmt. 2. Tex Star, as the obligor, remains liable for the deficiency under the Business and Commerce Code and under the terms of the PSAs. Therefore, Regal's acceptance of the collateral did not release Tex Star as the secondary obligor. Issues six, seven, eight, and nine are overruled.

### C. Tex Star's "Money Had and Received" Claim

Tex Star's original first issue challenged the trial court's failure to award to Tex Star the $975,000 it had deposited into the reserve.

Tex Star argued that the Bank One debt had been repaid and the reserve obligation no longer existed. Therefore, it argued that $975,000 should be returned to Tex Star. Regal argued that $975,000 was deposited in a reserve account as security against any deficiencies in the event of defaults on the notes it purchased.

On original submission, this court determined there was "no evidence or finding of any agreement that Regal would be entitled to keep the funds that Tex Star had deposited into the Bank One reserve after the line of credit was discontinued." 246 S.W.3d at 754. This court concluded that "Tex Star was entitled to either an award of the amount it had deposited to the Bank One reserve, or an offset of the damages awarded against it by that amount." *Id.*

Tex Star argues on remand that the supreme court did not address this holding in its opinion; therefore, Tex Star urges that this portion of our original opinion should not be revisited. We reject this contention because the supreme court reversed this court's judgment in its entirety and remanded "the other issues in the case" without limitation for "further consideration." 2010 WL 3277132, at *7. Because the supreme court did not limit its remand, we will address on remand Tex Star's claim regarding the $975,000 deposited into the reserve. *See Brewer & Pritchard, P.C. v. Johnson*, 167 S.W.3d 460, 465 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

The disputed $975,000 implicates the PSAs and the 1999 Bank One loan

14

agreement. The PSAs provide in part:

> DEALER RESERVES. Seller [Tex Star] have [sic] no rights to or in any reserve account which is specified below, as provided in this Agreement. [Tex Star] grants Purchaser [Regal] a security interest in all reserve accounts which are established for [Tex Star] pursuant to this Agreement. . . . Except only as otherwise provided in this Agreement, [Regal] may hold the amount of all reserve accounts until all Contracts which [Regal] have [sic] purchased from [Tex Star] have been liquidated, and any balance thereafter remaining shall be payable to [Tex Star]. . . . [Tex Star] understands and acknowledges that procedures relating to the reserve accounts as described below may result in an actual cost or economic loss to [Tex Star].

> Holdback Reserve. Purchaser [Regal] will deduct from the purchase price of each Contract purchased from Seller [Tex Star] an amount equal to $750 of the amount financed of each such Contract. The amount so deducted shall be retained by [Regal] in a reserve account identified as the "Holdback Reserve." The amount of the Holdback Reserve shall be used to reimburse [Regal] for any deficiency balances, costs and expenses of repossession or sale of collateral securing a Contract or any indebtedness to [Regal] which may be due and unpaid by [Tex Star] at any time.

The Bank One loan agreement provides in part:

> **Dealer Reserve Account** means funds reserved by [Regal] from the purchase price to be paid to [Tex Star] for a contract for use by [Regal] for satisfaction of . . . [Tex Star]'s recourse obligations to . . . [Regal].

After the Bank One loan agreement was signed, Regal continued to hold back $750 per note for deposit into the reserve. In addition to that amount, Tex Star deposited $975,000 into the reserve over 30 months to maintain the five percent level required by the Bank One loan agreement. When Bank One decided to exit the sub-prime auto lending market in 2002, it cancelled the line of credit Regal used to buy notes from Tex Star. Regal stopped buying Tex Star's notes, and Tex Star refused to maintain the reserve. Shortly thereafter, Tex Star suspended performance under the PSAs.

In its first issue, Tex Star seeks recovery of the $975,000 as "the return of monies it had paid and [Regal] had no right to hold." A claim for "money had and received" is equitable in nature. *Stonebridge Life Ins. Co. v. Pitts*, 236 S.W.3d 201, 203 n.1 (Tex.

15

2007). When a valid agreement addresses the matter, recovery under an equitable theory generally is inconsistent with the express agreement. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000). Accordingly, when a party claims that it is owed more than the contract provides, there can be no recovery for unjust enrichment if the same subject is covered by an express contract. *Id.* This rule applies regardless of whether the express contract is written or oral. *See Borrell v. Vital Weight Control, Inc.*, No. 14-07-00390-CV, 2009 WL 783342, at *3 (Tex. App.—Houston [14th Dist.] Mar. 26, 2009, no pet.) (mem. op.); *Ramirez Co. v. Hous. Auth. of City of Houston*, 777 S.W.2d 167, 173 & n.12 (Tex. App.—Houston [14th Dist.] 1989, no writ).

In this case, the "Holdback Reserve" provisions of the PSAs required establishment of a reserve to reimburse Regal for deficiencies remaining after the sale of repossessed cars. The "Dealer Reserve Account" provision in the Bank One loan agreement referred to "funds reserved by [Regal] from the purchase price to be paid to [Tex Star] for a contract for use by [Regal] for satisfaction of . . . [Tex Star's] recourse obligations to [Regal]." In answer to Questions 1A and 1B, the jury found that Regal and Tex Star agreed that Tex Star would maintain the reserve at the level required by the Bank One loan agreement.

Regal contends that the agreement by which Tex Star agreed to maintain the reserve at the level required by Bank One modified the PSAs to increase the size of the reserve account. McMillan testified that after Regal signed the Bank One loan agreement, the parties did not do anything different with regard to how they were deducting money from the reserve. McMillan testified that when Bank One requested that the reserve be maintained at five percent, McIngvale agreed to maintain the reserve at that level. McMillan testified he would not have agreed to obtain the Bank One loan if McIngvale had not agreed to fund the reserve at the increased level. McIngvale testified that he paid into the reserve because McMillan requested it. Not until shortly before this suit began, and he spoke with an attorney, did McIngvale believe that the reserve was not his obligation.

The jury found the parties entered into an agreement to maintain the size of the

16

dealer reserve at the level required by Bank One. Tex Star does not challenge on appeal the legal or factual sufficiency of the evidence to support the jury's answers to Questions 1A and 1B.

In any event, determining the legal effect of the jury's answers to Questions 1A and 1B is a question of law. Regardless of whether the agreement found by the jury in answer to Questions 1A and 1B is characterized as a modification of the PSAs or as a stand-alone agreement, this agreement constitutes an express contract. The existence of an express contract forecloses equitable relief under a "money had and received" theory. *See Fortune Prod.*, 52 S.W.3d at 684.

Tex Star argues that its obligation to maintain the reserve ended when the Bank One debt was repaid, so it is entitled to a refund of the account. Tex Star's argument, however, is contrary to the plain language of the PSAs. The PSAs provide that Regal may hold the amount of all reserve accounts until all contracts are liquidated. The condition requiring "any balance thereafter remaining shall be payable" has not been met on this record. At the time of trial, Regal still was servicing notes and still was at risk of default.

Tex Star's first issue is overruled.

### D. Attorneys' Fees

In its eleventh issue, Tex Star challenges the trial court's "joint" award of attorneys' fees on independent claims by separate parties. Tex Star asserts that the judgment erroneously awarded a lump sum of attorneys' fees to "Plaintiffs" without regard to which fees were attributable to Regal and which were attributable to Regal II. In support of its argument that this award is incorrect, Tex Star cites *Mullen v. Roberts*, 423 S.W.2d 576 (Tex. 1968), in which the supreme court determined that a judgment awarding damages jointly in favor of the plaintiffs did not conform to the pleadings where joint causes of action were not pleaded. *Id.* at 579.

In this case, both Regal entities pleaded for a joint award of attorneys' fees and jointly offered expert testimony regarding attorneys' fees. The court's charge submitted

17

the question of Regal's attorneys' fees jointly. Tex Star did not object to Regal's pleadings, evidence, or the court's charge. Tex Star did not object to the "joint" award of attorneys' fees until after verdict when it filed its motion for judgment. Regal presented the expert testimony of Kenneth Tekell on its attorneys' fees. The only objection made by Tex Star with regard to segregation of fees was when Tex Star objected that Tekell had not segregated the amount of fees expended on the individual claims being brought by Tex Star and the McIngvales. During his voir dire examination of Tekell, Tex Star's attorney questioned the witness on segregation of claims and referred to the attorneys' work for "the Regal Partnerships." Tex Star made no objection or request that the fees must be segregated between the two Regal entities; instead, Tex Star treated them as a single entity for purposes of attorneys' fees.

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion "with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." Tex. R. App. P. 33.1(a)(1)(A). In the context of segregation of fees, this court has held that if the issue is not raised "at the time in which the evidence of attorney's fees was presented and considered by the trial court, its objection is untimely and, thus, any error is waived." *Red Rock Props. 2005, Ltd. v. Chase Home Fin., LLP*, No. 14-08-00352-CV, 2009 WL 1795037, at *7 (Tex. App.—Houston [14th Dist.] June 25, 2009, no pet.) (mem. op.). By failing to raise its objection at a time when the parties or the trial court could have acted to correct any error, Tex Star waived its complaint about attorneys' fees. Tex Star's eleventh issue is overruled.

### E. Prejudgment Interest

In issue twelve, Tex Star argues the trial court erred in awarding prejudgment interest on all amounts from August 15, 2002, the date the original petition was filed, because Regal's deficiency claims did not begin to accrue until December 2002.

On August 15, 2002, Regal filed suit against Tex Star alleging Tex Star breached its agreement with Regal by failing to maintain the dealer reserve account, and seeking

declaratory judgment that Tex Star is responsible for maintaining the dealer reserve account. On November 15, 2002, Regal amended its petition to include a cause of action for breach of the agreement to provide administrative and collection services.

According to section 304.104 of the Texas Finance Code, prejudgment interest accrues beginning on the 180th day after the date the defendant receives written notice of a claim or on the date suit is filed, whichever occurs first. Tex. Fin. Code Ann. § 304.104 (Vernon 2006). When interpreting the intent and meaning of a statute, the court focuses on and will follow the plain language of the statute unless doing so leads to absurd and unintended consequences. *Fleming Foods, Inc. v. Rylander*, 6 S.W.3d 278, 284 (Tex. 1999). An award of prejudgment interest advances two ends: (1) achieving full compensation to plaintiffs; and (2) expediting both settlements and trials. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy*, 962 S.W.2d 507, 530 (Tex. 1998).

The trial court determined that the filing of Regal's original petition on August 15, 2002 triggered the accrual of prejudgment interest. However, Tex Star did not have notice of the cause of action on which Regal recovered until November 15, 2002, when Regal amended its petition to include a cause of action for Tex Star's refusal to provide administrative and collection services. The dual purposes of full compensation and expediting settlements and trials are not served by determining that prejudgment interest accrues before the date the defendant receives notice. Prior to the first amended petition, Tex Star could not have attempted settlement or expedited trial on that cause of action. The damages recovered by Regal relate to Tex Star's refusal to administer collection of the defaulted notes. The appropriate date for the accrual of prejudgment interest is November 15, 2002, when Regal amended its petition. Tex Star's twelfth issue is sustained.

## F. Regal's Conditional Issue on Fiduciary Duty Claims

Regal filed a conditional cross-appeal seeking reinstatement of fiduciary duty claims against two individual defendants in the event this court remands for a new trial. Because we are not remanding the entire case for a new trial, we need not address this

issue.

### III. Conclusion

We reverse the portion of the trial court's judgment that awards prejudgment interest and remand for computation of prejudgment interest based on accrual of prejudgment interest beginning November 15, 2002, rather than August 15, 2002. Having concluded that money had and received is not an available theory of recovery in this case, we remand to the trial court to consider the proper disposition of the $975,000 in the reserve and to expressly determine whether this amount is a ground for offset against damages awarded under Article 9. We affirm the remainder of the trial court's judgment.


                                        /s/      William J. Boyce
                                                 Justice



Panel consists of Chief Justice Hedges and Justices Brown, and Boyce.